THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN HERRERA, Defendant-Appellant.

First District (2nd Division)    No. 79-2489

Opinion filed May 26, 1981.

James N. Karahalios, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Dean C. Morask, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Following a bench trial, defendant John Herrera was convicted of three counts of attempt murder, and was sentenced to 4 years in the Department of Corrections. Defendant appeals, contending that his con-

stitutional right to representation by counsel was violated, in that defendant's trial counsel was not the attorney that defendant had retained and paid to represent him. Defendant also asserts that the trial court erred in failing to strike testimony regarding defendant's post-arrest oral statement, because that statement should have been disclosed pursuant to a discovery motion. Defendant further contends that he was not proved guilty beyond a reasonable doubt.

On May 14, 1978, at approximately 9:45 p.m., a number of young people were congregated on the northeast corner of 25th Street and Homan Avenue in Chicago. Police testimony indicated that this area is the "turf" of the Latin Kings street gang. Without warning, two men on the southeast corner of the intersection opened fire on the group at the northeast corner. One man was firing a .22-caliber rifle with a shortened stock, and the other man fired a pistol. Loretta Montez, age 15, was shot in the calf. Debbie Dunavan, age 15, was wounded in the abdomen. Efran Rios, age 18, was shot in the back. None of the three victims belonged to any street gang.

The southeast corner, where the gunmen stood, was illuminated by a street lamp. Although none of the victims could identify the gunmen, three individuals standing on or near the northeast corner testified that they recognized one of the shooters. Augustine Zambrano, Noel Roldan, and Oscar Solis all testified that they knew defendant's face and name from previous neighborhood encounters, and that defendant was the man with the rifle. Zambrano, Roldan, and others chased the two gunmen down the street, but the men eluded their pursuers. In the course of the chase, the man with the rifle looked back at the pursuers, affording Zambrano and Roldan a second chance to recognize him.

Zambrano, Solis, and Roldan were current or former members of the Latin Kings. Defendant was a member of a rival gang, the 26th Street Boys. On cross-examination, Zambrano admitted that gang members occasionally revealed to police the names of rival gang members involved in fights, in order to facilitate police investigation of rival gangs. The State, attempting to rebut the inference that the witnesses had falsely implicated defendant, offered Roldan's and Solis' account of events at the police station shortly after the shooting. Police initially arrested Rosalio Martinez, a 26th Street Boy, in connection with the shooting. At the police station, Roldan and Solis told officers that Martinez was not one of the gunmen. Martinez was not charged with the crimes and was later released.

Orlando Ramos, a former Latin King, testified for the defense. He stated that Rosalio Martinez was one of the shooters, and that defendant was not. The State countered Ramos' testimony by offering the statement of Loretta Montez, one of the victims. Montez' testimony placed Ramos

well to the north of the intersection, where his ability to see the gunmen would be questionable.

John Herrera testified in his own defense, and offered the testimony of three other alibi witnesses. Defendant stated that on the evening of May 14, he went to the home of his girlfriend, Josephine Granja. There they were joined by Beatrice Saenz, a friend of Josephine. The three decided to go to a motion picture and began walking to a bus stop. On the way, defendant's brother and sister-in-law, Jose and Julia Herrera, drove by and offered the three a ride. On the way to the theater, the group attempted to ascertain the time. They passed by the large outdoor clocks of the Crane Company at 41st and Kedzie and noticed that the clocks were inoperative. At 55th and Kedzie they passed Talman Federal Savings and Loan and noted that the time on the outdoor clock was 8:52 p.m. Shortly thereafter, they arrived at the Marquette Theater. Jose and Julia dropped defendant and the two girls off at the entrance and returned home. The three stayed in the theater until about midnight and returned home by bus. Defendant spent that night at Josephine's brother's house. Having learned that the police were looking for him, defendant surrendered the next day. The three alibi witnesses (Beatrice Saenz, Josephine Granja, and Julia Herrera) corroborated every material aspect of defendant's testimony.

During the State's case, Noel Roldan testified to an incident of intimidation that occurred on May 20, 1978, 6 days after the shooting. Roldan was in a tavern when he encountered defendant and two companions, Danny Gonzalez and Junior Marquez. Roldan testified that defendant asked him if he was going to testify in court and then threatened to kill him. Defendant allegedly punched him in the eye while Gonzales tore a gold chain from around his neck. On direct examination, defendant admitted that there had been a confrontation with Roldan in the tavern, but stated that he simply asked Roldan why he was lying about the incident of May 14. Defendant indicated that Gonzalez was more vigorous in his upbraiding of Roldan; defendant stated that Gonzalez pounded on Roldan's chest, took his gold chain, and punched him in the eye.

After defendant was charged in connection with the shooting, he retained attorney Sam Adam. Defendant paid Sam Adam $1000, believing this to be full payment for Mr. Adam's representation. Mr. Adam filed an appearance and appeared on defendant's behalf on four occasions. At other pretrial proceedings, defendant was represented by attorneys John DeLeon and Marvin Bloom. DeLeon and Bloom are sole practitioners, as is Adam, but the three attorneys share office space. Defendant did not retain DeLeon or Bloom, and neither filed an appearance in defendant's case. Whenever DeLeon or Bloom appeared in Adam's stead, defendant

asked them why Mr. Adam was not present. On the day set for trial, Sam Adam was absent and DeLeon and Bloom were present. Defendant stated that he learned 5 minutes before the trial was to start that Sam Adam would not be trying the case. DeLeon and Bloom stated that they learned on the morning of the trial that they would be conducting the defense. Defendant said nothing to the trial court concerning the substitution of attorneys.

On the morning of the second day of the trial, attorneys DeLeon and Bloom moved to withdraw from the case, stating that defendant had fired them. Defendant then referred to his refusal to sign over his bond money to the attorneys:

"THE DEFENDANT: The first time I walked into the office, and they said you give us $1,000 and we will take care of you. And now they told me to sign this, and I said it wasn't my money. I said it is my brother's money. I ain't willing to rob my brother for something that I have been accused of.

THE COURT: Well, Mr. Herrera, are you firing him, or do you want him to represent you?

THE DEFENDANT: He can't represent me if I can't pay him, and I ain't got any money to pay him."

The trial court suggested a short recess to resolve the problem, after which the following colloquy occurred:

"MR. DELEON: Your Honor, it seems that we have been able to work out our differences. It seems like Mr. Herrera is not unhappy with the representation that he is getting. That he has represented to me.

THE COURT: You have solved all the problems?

MR. DELEON: Yes.

THE COURT: Mr. Herrera, are you satisfied?

THE DEFENDANT: Yes."

At a post-trial hearing, defendant indicated that his response that he was satisfied did not mean that he was satisfied with the substitution of attorneys; rather, defendant was satisfied because, after being faced with the prospect of no representation, DeLeon and Bloom had agreed to stay on the case.

■■■ Defendant argues, correctly, that the constitutional right to counsel embraces the right to retained counsel of the defendant's own choosing. (See *People v. Johnson* (1979), 75 Ill. 2d 180, 185, 387 N.E.2d 688.) Defendant concludes that this right was violated when Sam Adam's abandonment of defendant prior to trial "forced" defendant to accept the representation of attorneys DeLeon and Bloom. Defendant cites *People v. Gazic* (1975), 30 Ill. App. 3d 1063, 336 N.E.2d 73 (abstract), where the reviewing court reversed a conviction because the defendant's chosen

counsel withdrew and was replaced, without defendant's permission, by other nonappointed counsel. In *Gazic*, however, the defendant did not appear at trial. The court in *Gazic* stated that a defendant can accept new counsel either by positive action or by acquiescence, and found that the defendant in that case had done neither. (*Gazic*.) In the instant case, defendant was present throughout the trial. His failure to voice an objection to the substitution of attorneys must be held an acquiescence in the change. When a privately retained counsel appears in court for a defendant, the trial court is entitled to assume that the attorney is the defendant's attorney of choice. (*People v. Coleman* (1972), 9 Ill. App. 3d 402, 407, 292 N.E.2d 483.) Under ordinary circumstances, the trial court is not obligated to inquire of the defendant to ascertain that the appearing counsel is his chosen attorney. (See *Coleman*, at 407.) While the defendant has a right to the attorney of his choice, he may be held to have exercised that right when he appears in court with an attorney, and treats the attorney as his retained counsel. (See *People v. Colon* (1973), 9 Ill. App. 3d 989, 994, 293 N.E.2d 468.) Following the *Colon* case, we find that defendant's acquiescence in DeLeon's and Bloom's conduct of his defense operated as an exercise of defendant's right to choose. Although DeLeon and Bloom filed no formal appearance in the case, this fact has no bearing on the manner in which defendant ratified their employment. Nor does the status of the attorneys—as sole practitioners, rather than partners or employees of Sam Adam—have a bearing on the outcome. The decisive factor here is defendant's conduct with respect to the attorneys who were present in court, and not the question of how those attorneys came to be associated with the case.[1]

Defendant also contends that the trial court erred in refusing to strike the testimony of assistant State's Attorney Ronin. Shortly after his surrender, defendant was interviewed by Ronin. According to Ronin's testimony, defendant related substantially the same alibi that he presented at trial, but stated that his brother had ascertained the time from the Crane Company's clock. Since the Crane Company's clocks were inoperative, this statement, if accurate, tends to weaken defendant's alibi defense. Ronin had summarized his interview with defendant in a memorandum. Defendant's discovery motion had requested, pursuant to Supreme Court Rule 412(a)(ii) (Ill. Rev. Stat. 1979, ch. 110A, par. 412(a)(ii)), any statements made by defendant. The State did not furnish a copy of the Ronin memo. At trial, defendant moved to strike Ronin's testimony. At a sidebar, the prosecutor unequivocally stated that, a few days earlier, he had

---

[1] In view of our conclusion that defendant accepted his trial attorneys, we need not address the ethical implications of the attorneys' conduct in this case. Suffice it to say that the commensalist relationship between Sam Adam and defendant's trial attorneys raises some questions of propriety.

read the Ronin memo, verbatim, to attorney Bloom over the phone. Attorney Bloom responded, "Your Honor, he was referring to a phone call. It's possible I might have had it. I don't remember that call." The trial court then denied the motion to strike Ronin's testimony.

Defendant states that this was error, and cites *People v. Szabo* (1977), 55 Ill. App. 3d 866, 871, 371 N.E.2d 117, for the proposition that all of defendant's statements must be tendered on a proper motion for discovery. *People v. Szabo* correctly states the law, but the holding in *Szabo* must be read in light of *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203, which holds that noncompliance with a discovery rule does not require reversal unless there is a showing of prejudice to the defendant. (79 Ill. 2d 103, 120.) In the instant case, the trial court might have believed the prosecutor's averment that he read the text of the Ronin memo to defendant's attorney in a phone conversation. If defendant was so informed, he could hardly claim prejudice resulting from unexpected testimony concerning his alleged statement.

■■ Assuming that no such phone call occurred, however, another fact precludes a finding of prejudice to defendant. In the course of discovery, police reports were tendered to defendant's attorney. These reports included the notation: "At this time, the offender, John HERRERA, was interviewed by the A.S.A. RONIN. * * * He stated that he knew the exact time because they had passed up the clock at the Crane Co. * * * It should be noted that the Crane Co. clock is inoperative." A recent opinion of this court is directly applicable to this situation. In *People v. Stewart* (1980), 84 Ill. App. 3d 855, 406 N.E.2d 53, this court stated that the purpose of Supreme Court Rule 412 is to avoid surprise and prejudice to the defendant. When the defendant's statement is contained in a police report that has been furnished pursuant to discovery, the purpose of the rule has been satisfied, and no prejudice results from the withholding of another memorandum of the same statement. (84 Ill. App. 3d 855, 860; see also *People v. Donald* (1977), 56 Ill. App. 3d 538, 543, 371 N.E.2d 1101.) Consequently, the prosecution's erroneous failure to provide a copy of the Ronin memo cannot be accounted reversible error.[2]

■■ Defendant's final contention is that he was not proved guilty beyond a reasonable doubt. The evidence in the instant case is sharply in conflict. Three members of a rival street gang, who knew defendant by name and

---

[2] At oral argument of this case, defendant's attorney raised for the first time an alternative basis for finding prejudice in the withholding of the Ronin memo. The memo contained a reference to defendant's statement that, after returning home from the theater on the night of the shooting, he saw police cars in front of his home and decided to spend the night at the home of Josephine Granja's brother. Assistant State's Attorney Ronin related this statement in his testimony. This argument has not been timely raised, and is therefore waived. See *People v. Allen* (1972), 7 Ill. App. 3d 875, 877, 289 N.E.2d 21; Supreme Court Rule 341(e)(7) (82 Ill. 2d R. 341(e)(7)).

face, recognized him as one of the shooters. Defendant produced three alibi witnesses, all of whom were friends or family members. (Defendant subsequently married Josephine Granja.) In such a case, the decision of the trier of fact hinges on the credibility of the witnesses and the weight to be given their testimony, and the reviewing court may not substitute its judgment for that of the trier of fact. (See *People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) The trial court's finding of guilty will not be reversed unless the evidence is so improbable as to create a reasonable doubt of defendant's guilt. (See *People v. Rivera* (1979), 72 Ill. App. 3d 1027, 1042, 390 N.E.2d 1259.) Reviewing the evidence in light of these principles, we find no supportable basis for reversing the decision of the trial judge.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

HARTMAN, P. J., and DOWNING, J., concur.