THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JUAREZ HOWARD, Defendant-Appellant.

First District (2nd Division)    No. 81—2158

Opinion filed February 14, 1984.—Rehearing denied March 13, 1984.

Kenneth L. Jones, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and James J. Bigoness, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Juarez Howard, Andre Howard and Michael Sommerville were charged by indictment with murder, armed robbery, burglary, armed violence, home invasion, and conspiracy. Andre Howard entered into a plea bargain with the State and Juarez Howard and Michael Sommerville were tried together. All charges except those for murder and armed robbery were dismissed at various stages of the proceedings.

The first two trials resulted in mistrials. Prior to the third trial, a ruling was made to sever the trials of Sommerville and Juarez Howard. Following a third jury trial, Juarez was found guilty of murder and armed robbery and was sentenced to concurrent terms of 30 years for murder and 15 years for armed robbery. Defendant Howard appeals.

Juarez Howard (hereinafter defendant), Andre Howard, Michael Sommerville, Randall Rhodes, and Thurston "Butch" Rogers planned to rob a drug dealer who Andre knew. Everyone except Andre participated in the robbery. The group was to meet back at Andre's apartment after the robbery.

On October 25, 1979, defendant, Michael, Randy and Butch went to the drug dealer's apartment. Randy was carrying a knife, the rest of the group had handguns. Defendant and Michael entered the apartment and initiated the robbery. When Michael let Randy and Butch into the apartment, the victim, Bert Lee, lunged toward defendant. Defendant, Michael and Butch fired at Lee, striking him several times. Defendant then grabbed a bag of marijuana off the table and the group fled in different directions.

Soon thereafter, the group met back at Andre's apartment and went their separate ways.

Chicago police investigators O'Leary and Seery were assigned to investigate the shooting of Bert Lee on the morning of October 26. They questioned Andre Howard at his apartment. He directed the officers to an apartment where one of the assailants, Randall Rhodes, and two others, James Tate and Michael Hyler, were arrested and taken to the police station for questioning. Andre also gave the officers the telephone number of another of the assailants named "Speedy." Speedy is defendant's nickname.

The investigators determined that Speedy's phone number belonged to Daisy and Adair Sheats of 2409 East 78th Street, Chicago. The Sheats are defendant's aunt and uncle. The officers went to the Sheats' residence and conducted a search of a bedroom in the apartment where two handguns were found. One of the guns proved to have been used in the robbery/ murder of Bert Lee.

At approximately 10 p.m. on October 26, O'Leary and Seery arrested defendant as he was walking down the street. He was taken to the police station for questioning. The State's evidence concerning defendant's interrogation revealed the following:

An hour after defendant's arrest, at about 11 p.m. on October 26, defendant gave an oral statement to Investigator O'Leary. The substance of that statement was virtually identical to the earlier summa-

tion of facts. At the conclusion of his statement, defendant told O'Leary about his asthmatic condition and O'Leary promised to get defendant's medicine from his family.

Assistant State's Attorney Roy talked with defendant at 2 a.m. on October 27, at which time he gave Roy an oral statement. At the conclusion of the statement, Roy asked defendant if he would give his statement to a court reporter and he said that he would.

A court reporter arrived at the station at 6:15 a.m. on October 27. Written statements were taken from Michael Sommerville, Randall Rhodes, and Andre Howard. At about 1:30 p.m., defendant's written statement was taken. Defendant later signed the statement.

Defendant's version of the interrogation differed from the State's in several respects. Defendant claims that the police withheld his asthma medicine until after he confessed. He also asserts that O'Leary put a paper bag over his head and played Russian roulette with him until he confessed.

At the outset of the trial which is the subject of this appeal, defendant filed motions to quash arrest, suppress statements and suppress evidence. The motion to suppress evidence concerned the guns discovered in a bedroom in the apartment leased by Daisy and Adair Sheats. The State's version of the search as revealed by the evidence is as follows:

Officers O'Leary and Seery went to the Sheats' apartment at 2409 East 78th Street, where they were greeted by Mr. Sheats. The officers identified themselves and informed Mr. Sheats that they were investigating a homicide. The officers asked if Speedy was there and Mr. Sheats replied that he was not but that the officers were welcome to search his bedroom. Officer O'Leary then showed Mr. Sheats a consent-to-search form and asked him to sign it, which he did. Mrs. Sheats was present and signed the form as a witness. The form mistakenly referred to the Sheats' address as 2402, rather than 2409, East 78th Street. The officers entered the bedroom and found two guns under some clothes on the floor. One of the guns had been used in the shooting. The officers also found a jacket which resembled one worn by one of the assailants.

The Sheats testified at the hearing on the motion to suppress and denied that they had consented to the search. According to them, the officers simply asked where Speedy's room was and then proceeded to search it. They denied having signed a consent-to-search form. On cross-examination, however, Mrs. Sheats conceded that she could not remember whether or not she had signed a form. Mr. Sheats made this same concession. Mrs. Sheats also testified that the signatures on

the form looked like hers and her husband's. The court denied defendant's motions to suppress and to quash arrest.

At the close of the first trial, the jury began deliberations just before 4 p.m. on Thanksgiving eve. Just before 10 p.m., the trial judge stated that he was not going to allow the trial to extend through Thanksgiving Day if it was not necessary. The judge then expressed his intention to call the jury out and question them about the possibility of reaching a verdict. Both the State and defense counsel objected. The court stated that if any of the jurors said that a verdict was possible, it would sequester the jury for the night and resume deliberations the following day, Thanksgiving. The jury was called out and each juror was asked about the possibility of reaching a verdict if deliberations continued. Eleven jurors replied that a verdict was not possible and the foreman said he was unsure. The court then declared a mistrial.

Following the second trial, the jury began deliberating at 7:30 p.m. The jury was sequestered for the night at 10 p.m. and they resumed deliberations at 9:30 a.m. the next day. At 2 p.m., the foreman sent a note to the judge informing him that the jury could not agree on a verdict. The judge called the jury out, gave them the *Prim* instruction (see *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601), and ordered them to continue to deliberate. At 9:30 p.m., the court called the jury out and asked them if it was possible that they could reach a verdict. Eight jurors responded "no," three said "yes," and one said "maybe." The court then declared a mistrial over the objections of the State and defense counsel.

Following a third trial, a jury found defendant Juarez Howard guilty of murder and armed robbery and he was sentenced to concurrent terms of 30 years for murder and 15 years for armed robbery. Following a denial of his post-trial motions, defendant instituted this appeal.

Defendant first contends that mistrials were improperly declared in his first two trials and that therefore, the State was barred on double jeopardy grounds from reprosecuting defendant on the same charges involved in the earlier trials.

■ Section 3—4(a)(3) of the Criminal Code of 1961 provides that a subsequent prosecution is barred if a former prosecution "[w]as terminated improperly after the jury was impaneled and sworn \*\*\*." (Ill. Rev. Stat. 1981, ch. 38, par. 3—4(a)(3).) With respect to the declaration of a mistrial, a proper termination occurs when, in the court's opinion, there is a manifest necessity for a mistrial to be declared or the ends of public justice would otherwise be defeated. (*People v. Bean* (1976), 64 Ill. 2d 123, 128, 355 N.E.2d 17.) Defendant contends

that there was no "manifest necessity" for the declaration of a mistrial in the earlier trials and that therefore, a third prosecution was barred.

When in the court's opinion a jury is hopelessly deadlocked, it is clearly proper to discharge the jury. (See *People v. Mays* (1962), 23 Ill. 2d 520, 524, 179 N.E.2d 654.) There is no fixed minimum time that a jury must be allowed to deliberate before a mistrial is declared, and the court must be accorded great latitude in exercising its informed discretion in this respect. (*People v. Preston* (1979), 76 Ill. 2d 274, 283, 391 N.E.2d 359.) *People v. Mays* (1962), 23 Ill. 2d 520, 524, 179 N.E.2d 654, and *People v. DeFrates* (1946), 395 Ill. 439, 70 N.E.2d 591, *cert. denied* (1947), 331 U.S. 811, 91 L. Ed. 1831, 67 S. Ct. 1201, illustrate the breadth of the court's discretion in deciding when a mistrial is warranted by a hung jury. In *Mays*, the court declared a mistrial based on a hung jury after only four hours of jury deliberation. In *DeFrates*, a mistrial was declared after only 45 minutes of deliberation. In both cases, the reviewing courts deferred to the decision of the trial courts because there was no showing that the trial courts had abused their discretion.

Here, the jury in the first prosecution had been deliberating over five hours when they were called back into court. The judge asked the foreman if a verdict had been reached and the foreman said "No." The foreman went on to state that he did not foresee the possibility of a verdict being reached any time in the "very near future." The judge asked the foreman if a verdict could be reached "at any time" and the foreman replied "No." The court proceeded to poll the jury to determine if any of the jurors felt that there was a reasonable probability that they might arrive at a verdict. Eleven of the jurors felt that a verdict was not possible and one was unsure. The court then declared a mistrial.

The jury in the second prosecution deliberated for over 14 hours. After 2½ hours of deliberation the first night, the jury was called back into court. The foreman indicated that he was unsure how long it would take the jury to reach a verdict and the court ordered the jury sequestered for the night.

The jury resumed deliberations at 9:30 a.m. the next day. At 2 p.m., the judge received a note from the foreman informing him that the jury could not agree on a verdict. The jury was then called back into court and was given the *Prim* instruction. (See *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The jury resumed deliberations until 9:30 p.m. At that time, the jury was called back into court and each juror was asked if there was a reasonable probability that a ver-

dict would be reached. Eight jurors replied "No," three said "Yes," and one said "Maybe." The court then declared a mistrial.

■■ In the second prosecution, we find absolutely no evidence of an abuse of discretion. In the first prosecution, the judge expressed his desire that deliberations not continue into the following day, which was Thanksgiving, but the judge made it clear that if the situation required, the jury would deliberate through Thanksgiving Day. The court's intentions in this respect were evidenced by his statement that if *any* of the jurors felt that a verdict could be reached, the jury would be housed for the evening. Beyond the court's statement concerning Thanksgiving deliberations, the only arguable evidence of an abuse of discretion is the fact that only five hours of deliberation were allowed before a mistrial was declared. But, as was noted earlier, the length of deliberations is not a factor in determining if a mistrial was improvidently granted. (See *People v. Preston* (1979), 76 Ill. 2d 274, 283, 391 N.E.2d 359; see, *e.g., People v. Mays* (1962), 23 Ill. 2d 520, 179 N.E.2d 654 (four hours); *People v. DeFrates* (1946), 395 Ill. 439, 70 N.E.2d 591 (45 minutes); see also, *e.g., People v. Partee* (1977), 52 Ill. App. 3d 178, 367 N.E.2d 188 (4 hours 45 minutes).) Under the totality of the circumstances presented, it does not appear that the courts in the first two prosecutions abused their discretion in granting mistrials. Those mistrials did not, therefore, serve as a bar to the prosecution presented here.

Defendant next contends that the trial court erred in failing to grant defendant's motion to suppress items seized during the warrantless search of defendant's bedroom. This contention consists of two issues. First, did Daisy and Adair Sheats consent to a search of their nephew's bedroom and, second, did the Sheats possess the authority to give a valid consent to search the bedroom.

As to the first issue, the evidence at trial consisted of the testimony of Mr. and Mrs. Sheats and Officer O'Leary. O'Leary testified that he and two other officers went to the Sheats' residence where they were met by Mr. Sheats. After being told that the officers were looking for an individual known as "Speedy" in connection with a homicide investigation, Mr. Sheats informed the officers that Speedy was his grandson (actually, he was a nephew) but that he was not home at the time. Sheats then pointed toward defendant's bedroom and told the officers that they were welcome to search it. Officer O'Leary produced a consent-to-search form and asked Mr. Sheats to sign it. Sheats read and signed the form after commenting that defendant had caused him a lot of problems. Mrs. Sheats signed the form as a witness. The officers then proceeded to search the room

where they found a weapon used in the robbery/murder and a jacket similar to that worn by one of the assailants.

Mr. and Mrs. Sheats denied that they consented to the search of defendant's room. They testified that the officers simply asked which room was defendant's and then proceeded to search it. On cross-examination, however, both Mr. and Mrs. Sheats admitted that they could not remember if they had signed the consent forms. Mrs. Sheats conceded that the signatures on the forms looked like hers and her husband's. Mr. Sheats' driver's license and a piece of paper with Sheats' signature were entered into evidence. The court found that Mr. Sheats' signature was on the consent-to-search form and that Mr. and Mrs. Sheats had voluntarily consented to have defendant's room searched. Defendant's motion to suppress was denied.

■■ It is apparent from the foregoing summation that the evidence was merely conflicting on the issue of whether Mr. and Mrs. Sheats consented to the search. Under these circumstances, the resolution of the question is left to the trial court whose decision will be accepted on review unless clearly unreasonable. (*People v. Peterson* (1959), 17 Ill. 2d 513, 514-15, 162 N.E.2d 380; see *People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1; *People v. Salgado* (1980), 83 Ill. App. 3d 653, 656, 404 N.E.2d 432.) Defendant asserts that it is clearly unreasonable to believe that Mr. and Mrs. Sheats gave their unsolicited consent to a search of their nephew's room. But it appears that there are several plausible reasons why the Sheats may have consented to the search: to prove they had nothing to hide; to prove that their nephew had nothing to hide; or simply to cooperate with the police. The primary task involved in ruling on defendant's motion to suppress was to resolve the conflicting testimony and to determine the credibility of the witnesses. These are questions left largely to the discretion of the trial court. We find the trial court's conclusion that consent to search was voluntarily given to be reasonable and not an abuse of discretion.

■■ The second issue involved in this contention is whether the Sheats possessed the authority to give a valid consent to a search of defendant's bedroom. In cases involving third-party consent to search, the standard which determines if the consent was authorized is the common authority test. (See *United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993.) Under that test, consent to search may be given by "persons generally having joint access [to the searched premises] or control for most purposes." (415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7.) In cases in which it is established that defendant re-

sides with parents or close relatives, and the parents or relatives consent to a search of defendant's bedroom, it should be presumed that there is a common authority over the bedroom sufficient to authorize the consent to search. (See *People v. Daniels* (1971), 16 Cal. App. 3d 36, 43-44, 93 Cal. Rptr. 628, 631-32.) This presumption may be overcome by evidence indicating that defendant had exclusive possession of the searched premises. See *People v. Daniels* (1971), 16 Cal. App. 3d 36, 43-44, 93 Cal. Rptr. 628, 631-32; see also *People v. Nunn* (1973), 55 Ill. 2d 344, 352-53, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608; *State v. Peterson* (Mo. App. 1975), 525 S.W.2d 599, 608-09.

■ In Illinois, the cases involving third-party consent to search by a parent or relative have focused on whether defendant has established his exclusive possession of the searched premises. (See, *e.g., People v. Stacey* (1974), 58 Ill. 2d 83, 89-90, 317 N.E.2d 24; *People v. Nunn* (1973), 55 Ill. 2d 344, 351-52, 353, 304 N.E.2d 81, *cert. denied* (1974), 416 U.S. 904, 40 L. Ed. 2d 108, 94 S. Ct. 1608; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93, 321 N.E.2d 38.) Specifically, two factors indicative of exclusive possession which were noted by the courts in *Stacey, Nunn* and *Johnson* were whether the room was locked in defendant's absence and whether defendant gave explicit instructions not to allow anyone into the bedroom. (See *People v. Stacey* (1974), 58 Ill. 2d 83, 89; *People v. Nunn* (1973), 55 Ill. 2d 344, 352-53; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93.) Where the evidence fails to establish these two factors, the attack on the third-party consent to search has failed. See *People v. Stacey* (1974), 58 Ill. 2d 83, 89; *People v. Johnson* (1974), 23 Ill. App. 3d 886, 892-93.

■ In the instant case, the State's evidence established that the Sheats leased the apartment in which defendant resided. The evidence also revealed that defendant had his own bedroom in the apartment which was never locked. There was no evidence that defendant had instructed the Sheats not to enter his bedroom in his absence or that he had left instructions not to allow anyone else into the bedroom. Under these circumstances, we conclude that the Sheats possessed the requisite authority to consent to a search of defendant's bedroom and find that the third-party consent to search in this case was authorized.

Defendant next contends that the State's "deliberate destruction of discoverable material" requires that his conviction be reversed.

Supreme Court Rule 412 provides in pertinent part that the State shall disclose to defense counsel "any written or recorded statements

and the substance of any oral statements made by the accused \*\*\* and a list of witnesses to the making and acknowledging of such statements." (87 Ill. 2d R. 412(a)(ii).) In the instant case, defendant objects to the destruction of handwritten notes taken by an investigator on one occasion and by an assistant State's Attorney on another. The notes concerned oral statements that defendant made to the investigator and attorney. The investigator destroyed his notes after establishing that the substance of defendant's oral statement was contained in a police report. The assistant State's Attorney destroyed her notes after noting in a memo to her superior that the substance of defendant's oral statement was in conformity with a written statement signed by defendant. The police report was turned over to defense counsel during discovery; the memo was work product, and, therefore, not discoverable. See 87 Ill. 2d R. 412(j)(i).

■ Defendant contends that the handwritten notes taken by the investigator and assistant State's Attorney might have contained evidence that defendant was coerced into confessing. Defendant asserts that these notes were discoverable and that their destruction requires that defendant be granted a new trial. But defendant misapprehends the purpose of discovery. It is not, as defendant would have us believe, to provide evidence in defendant's defense. Rather, it is to prevent the production of surprise evidence or testimony which would serve to prejudice defendant's case. See *People v. Herrera* (1981), 96 Ill. App. 3d 851, 856, 422 N.E.2d 95.

■ In the instant case, the substance of the handwritten notes were contained in the police report and in defendant's written statement, both of which defendant obtained in discovery. Thus the destruction of the notes did not and, indeed, could not have resulted in the type of surprise testimony which the discovery rules were designed to prevent. Moreover, the manner in which the investigator and assistant State's Attorney confirmed that the substance of their notes was documented elsewhere prior to destroying the notes clearly conforms with the discovery rules. The rules require only that the *substance* of any oral statements be disclosed. (87 Ill. 2d R. 412 (a)(ii).) They do not require that every documentation of these statements be disclosed. (See *People v. Herrera* (1981), 96 Ill. App. 3d 851, 856, 422 N.E.2d 95.) Thus, by ensuring that the substance of their notes were documented elsewhere before destroying them, the investigator and assistant State's Attorney acted in conformance with the discovery rules. For all the foregoing reasons, we find that the handwritten notes were not discoverable material and that their destruction does not entitle defendant to a new trial.

Defendant next contends that the erroneous admission of irrelevant hearsay evidence substantially contributed to his conviction.

One of the weapons used in the robbery/murder was discovered in the bedroom of an apartment on the second floor of an apartment building at 2409 East 78th Street, Chicago. This apartment was leased by Daisy and Adair Sheats. In an effort to draw a connection between the discovery of this weapon and defendant, the State subpoenaed Mr. and Mrs. Sheats to testify that defendant's bedroom was the room in which the weapon was found. The Sheats, however, failed to appear to testify.

In lieu of the Sheats' testimony, the State introduced several rental agreements into evidence. The rental agreements were between Adair Sheats and the owner of the building at 2409 East 78th Street, Chicago. The subject of the agreements was the second-floor apartment at that address. The yearly agreements covered the years 1972-1982.

The rental agreements covering the period 1972 to September 1978 named the defendant as an occupant of 2409 East 78th Street. The subsequent agreements named only Adair and Daisy Sheats as occupants. The agreements were entered into evidence under the business records exception to the hearsay rule.

Defendant's objection to the admission of the agreements is that they do not prove what the State contends they prove. The trial court found that the agreements tended to prove that defendant was living at 2409 East 78th Street at the time the murder weapon was found. But the rental agreements did not name defendant as an occupant after September 1978. The weapon was discovered on October 27, 1979. Thus, the rental agreements fail to prove that defendant was living with the Sheats at the time the murder weapon was discovered.

■■ In addition to this irrelevant evidence, however, there was competent evidence produced by the State that defendant lived with the Sheats on October 27, 1979. Investigator James O'Leary testified that on that date, Mr. Sheats told him that defendant lived with the Sheats. In addition, Assistant State's Attorney Roy testified that defendant gave 2409 East 78th Street as his home address. Thus, even though the rental agreements were erroneously admitted, defendant was not prejudiced thereby. We find that any error in admitting the rental agreements was harmless beyond a reasonable doubt.

■■ ■ Defendant's next contention concerns several allegedly improper actions by the prosecution in its case in chief and rebuttal

closing argument. Defendant concedes that, individually, these actions are insufficient to warrant a new trial. However, relying on the authority of *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924, defendant asserts that the cumulative impact of these alleged errors warrants a new trial. We will address the instances of alleged error individually before discussing their cumulative impact.

Defendant first cites approximately 10 instances in which the prosecution allegedly attempted to elicit inadmissible hearsay from a State witness. During the examination of Investigator James O'Leary, the State elicited testimony that O'Leary interviewed several witnesses connected with the murder for which defendant was charged. After establishing, as to each witness, that an interview was conducted, the prosecutor followed up with a question designed to elicit the substance of the interviews. In each instance, objections were immediately made and sustained before the witness could respond. As to several other instances cited by defendant, objections were made to improper answers rather than improper questions. In each of these instances, the objections were sustained and the jury was immediately admonished to disregard the answers. In one other instance, defendant's objection to a question was overruled.

It is not apparent that the foregoing instances of alleged prosecutorial misconduct were error. Each question noted above concerned a separate conversation. The prosecution did not persist in attempting to elicit testimony which the trial court had previously ruled was inadmissible. Each objection to an improper question was immediately sustained by the court and no improper testimony was thereby elicited. The only improper testimony resulted from unresponsive answers by the witness, not from an improper question. For the foregoing reasons, we find that the State's questioning did not prejudice defendant in any way.

Defendant next cites two attempts by the State to put before the jury evidence that arrest warrants were issued for Daisy and Adair Sheats because of their failure to answer a subpoena. An issue before the jury was whether defendant lived with the Sheats and they had been subpoenaed to testify on this question. Because of what it perceived as an attack on Investigator O'Leary's testimony that defendant lived with the Sheats, the State attempted to bring out the fact that a warrant for the Sheats' arrest had issued.

While questioning Investigator O'Leary, the State elicited the fact that the Sheats had been subpoenaed to testify. The State then asked if an arrest warrant had been issued. Defense counsel immediately objected and a sidebar ensued. The court ruled that the fact that a

subpoena had issued was proper but that the fact that an arrest warrant had issued was not admissible. The State asked no further questions of the witness.

Two days after Investigator O'Leary testified, the State called Investigator Johnson. Johnson had apparently been assigned the task of serving the arrest warrant on the Sheats. In response to an inquiry by the State as to what his present assignment was, Johnson replied, "this morning I received an arrest warrant signed by —." Defense counsel immediately objected and the court ordered a sidebar. When it became apparent to the court that Johnson's answer concerned the Sheats, the court prohibited any further questioning on the matter and the State ceased that line of questioning.

The only possible error which might have resulted from the preceding questions involves the prosecutor's query as to whether a warrant had issued for the Sheats' arrest. The court held that it was proper to bring out the fact that a subpoena had been issued and Investigator Johnson was never able to reveal that he was assigned the task of serving an arrest warrant on the Sheats. Neither of these factors can be said to have prejudiced defendant. And as to the prosecutor's question as to whether an arrest warrant had issued, any prejudice that may have resulted is minimal because the witness, Investigator O'Leary, was not permitted to respond to the question. Upon examining this point of error, we find that the prosecution's unanswered query did not constitute a material factor in defendant's conviction and that, had the question not been asked, the jury would not have reached a different conclusion. See *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68.

Defendant's next citation of alleged prosecutorial error concerns two references by the State to a pretrial ruling by the court. While cross-examining Investigator O'Leary, defense counsel sought to attack the validity of the consent-to-search form by eliciting testimony that the form read "2402 East 78 Street," rather than "2409." The State objected to defense counsel's line of questioning by noting that "2409 East 78th Street, you [the court] made that determination. *** You ruled on that motion." In response to a second attempt by defense counsel to point out the discrepancy between the true address and the address on the consent-to-search form, the State objected and said "you [the court] ruled on the authority [to search]." Defendant asserts that the prosecution's comments were improper attempts to put before the jury the result of a pretrial hearing, citing *People v. Carter* (1979), 73 Ill. App. 3d 406, 392 N.E.2d 188. A closer examination of these comments, however, reveals that they were necessitated

by defense counsel's improper line of questioning.

Defendant's questioning concerning the accuracy of the address on the consent-to-search form was essentially an attempt to raise in the minds of the jury a doubt as to Investigator O'Leary's authority to conduct a search of defendant's bedroom. But any attack on the validity of a search must be brought in a pretrial motion where the opportunity to do so exists. (See *People v. Kahl* (1978), 63 Ill. App. 3d 703, 380 N.E.2d 487.) Once the court has ruled on the motion to suppress, that ruling is binding on the parties in a subsequent trial proceeding. See *People v. Holland* (1972), 9 Ill. App. 3d 536, 541, 292 N.E.2d 547, *affirmed* (1974), 56 Ill. 2d 318, 307 N.E.2d 380.

In the instant case, the trial court denied defendant's pretrial motion to suppress. Defendant failed to raise the issue of the incorrect address in support of his motion and was thereby precluded from raising the issue at trial. (See *People v. Malaszenko* (1979), 76 Ill. App. 3d 1, 5-6, 393 N.E.2d 1350.) Moreover, even if defense counsel had been allowed to raise the issue at trial, it should have been raised in a written motion to suppress and argued before the judge, not the jury. See Ill. Rev. Stat. 1981, ch. 38, par. 114—12(c).

Defense counsel's attempt to put before the jury the question of Investigator O'Leary's authority to search was clearly improper. Thus, any response by the prosecution to defense counsel's improper actions could only be characterized as invited comment. Moreover, upon examining the prosecution's comments, we conclude that they were not so prejudicial as to warrant a new trial. See *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68.

Defendant next cites numerous comments by the prosecution in closing argument which defendant characterized as improper attacks on defense counsel which inflamed the jury and which warrant a new trial. The comments ranged from accusations that defense counsel was distorting the evidence, to references to counsel as a "high-priced lawyer" hired to get defendant off, to statements that counsel's arguments are something he has presented "in every murder that he defends in this building."

It is clearly improper to make statements about the conduct of defense counsel solely to arouse the antagonism of the jury against him. (*People v. McKnight* (1979), 72 Ill. App. 3d 136, 146, 390 N.E.2d 379.) It is also error to accuse counsel of fabricating his case. (See *People v. Lavoy* (1980), 91 Ill. App. 3d 639, 644, 415 N.E.2d 487.) But not every attack on defense counsel entitles defendant to a new trial. Only when the remarks can be said to have substantially prejudiced defendant or when it can be said that were it not for the remarks,

the verdict would have been different do the remarks constitute reversible error. (See *People v. Miller* (1981), 101 Ill. App. 3d 1029, 1039, 428 N.E.2d 1038.) In light of defendant's admissions of guilt made to Michael Hyler, Investigator O'Leary and Assistant State's Attorney Roy, not to mention his written confession, it is unlikely that the jury would have reached a different verdict had the attacks on defense counsel not been made, and we doubt that the comments played a significant role in the conviction. See *People v. Witted* (1979), 79 Ill. App. 3d 156, 165, 398 N.E.2d 68.

Examining defendant's argument of cumulative error, it becomes apparent that only the attacks on defense counsel can properly be characterized as "error." Because that error was insufficient to warrant a new trial, it follows that defendant's cumulative error argument must also fail.

■■■ Defendant's final contention concerns the presentence report. Defendant contends that the report was deficient in that it failed to include information required by statute. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—3—2(a)(1).) For this reason, defendant asserts that his sentence should be vacated.

It appears, however, that defendant failed to object to the deficient report at the sentencing hearing and to raise the issue in his post-trial motion. He has therefore waived the issue on appeal. See *People v. Collins* (1982), 109 Ill. App. 3d 1076, 1080, 441 N.E.2d 935; *People v. Gornick* (1982), 107 Ill. App. 3d 505, 515, 437 N.E.2d 892; *People v. Lane* (1980), 91 Ill. App. 3d 827, 830, 414 N.E.2d 1249.

For the reasons expressed herein, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and PERLIN, J., concur.