THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMON BURGOS, Defendant-Appellant.

First District (6th Division)   No. 1—91—2154

Opinion filed February 26, 1993.—Rehearing denied April 26, 1993.

Frederick F. Cohn, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Ramon Burgos, was convicted of murder, attempted murder, armed violence and aggravated battery, and was sentenced to 30 years' imprisonment. On appeal, defendant raises as issues whether: (1) the State proved him guilty beyond a reasonable doubt; (2) the trial court erred in denying an evidentiary hearing on defendant's post-trial motion for a new trial; (3) evidence of gang membership was improperly admitted; (4) the State failed to comply with discovery rules; (5) the trial court erred in refusing to give a certain instruction to the jury; and (6) defendant's due process rights were violated when the State made improper implications about fingerprint testimony unsupported by evidence.

Following an evidentiary hearing, defendant's motions to suppress identification testimony, to quash arrest and suppress evidence were denied. Defendant and codefendant Juan Rivera were tried simultaneously. Defendant chose a jury trial, and Rivera received a bench trial.

Joseph Siudut, age 24, and the deceased, Shawn Mooney, age 19, had known each other for four years. Around 8 p.m. on August 24, 1989, Siudut drove to a friend's house located at the intersection of

Barry and Pulaski in Chicago, where he met the deceased. They then drove to the intersection of North and Sawyer to buy some marijuana. Siudut noticed two individuals flashing gang signals with their hands. Siudut informed them that they were not involved in any gangs, but wished to buy some marijuana. The two men, whom Siudut identified as defendant and Rivera, approached the driver's side of the car and directed the deceased to pull over to the curb. The men walked over to the passenger side of the car and asked Siudut for money for the drugs. Defendant walked away for a brief moment and returned to the passenger side of the car with a gun. Defendant held a gun to Siudut's head and threatened to kill him. Siudut moved the gun away from his head and told the deceased to drive away. The deceased did not immediately obey Siudut's instruction, so Siudut reached over, accelerated the gas pedal, and started driving. As they drove away, Siudut heard approximately six gunshots, and felt a bullet graze his back.

Siudut realized that the deceased had sustained a serious gunshot wound. En route to the hospital, Siudut was stopped by the police, who asked him what had occurred. He informed them that the deceased had been shot, and they called an ambulance. After the ambulance arrived, the police drove Siudut to the location of the shooting. Siudut was then taken to the hospital. After Siudut received treatment for his wound, he was taken to the police station where he viewed a lineup. He identified defendant and Rivera as the perpetrators of the offense and identified defendant as the actual shooter. Siudut stated that he had drunk one beer prior to the time of the shooting, but denied using any drugs.

Officer Arthell Goodwin of the Chicago police department testified for the State that he was on duty on the night of the offense. Together with his partner, Clyde Hynes, Goodwin was on routine patrol in a marked squad car. Around 9:40 p.m., Goodwin was in the vicinity of Pulaski and Fullerton when he observed a dark-colored vehicle without lights proceed through the intersection at a high rate of speed. After the car proceeded through a red light, Goodwin activated the emergency equipment and pursued the vehicle for approximately seven blocks. Goodwin approached the driver's side and observed a person slumped over the wheel. The deceased appeared to be unconscious, and he noticed blood on the back of his neck. Hynes approached the passenger side where Siudut was sitting. The rear window of the vehicle was broken out, and there were dents and holes around the right rear side.

Goodwin described Siudut's demeanor as nervous, shaky and upset. Siudut explained that he was trying to drive the deceased to Belmont Hospital. Upon discovering that Siudut and the deceased were victims of gunshot wounds, Goodwin notified Area 5 violent crimes. He received a flash message from another police unit that they had apprehended two individuals as possible suspects in the shooting incident.

Officer Curt Hagemann of the Chicago police department testified that at around 9:30 p.m., he was on patrol with his partner, Officer Bill Whalen, when they observed two male Hispanics run across the intersection of Avers and Palmer. Hagemann made an in-court identification of defendant and Rivera as the men they saw, and further testified that defendant was holding a gun. Hagemann proceeded northbound on Avers in his squad car, and then exited his vehicle and pursued the two men on foot into a gangway adjacent to a brick two-flat building. Hagemann saw defendant throw an object onto a garage roof in the next yard. He ordered the men to halt. The officer handcuffed the men and arrested them. Defendant was apprised of his *Miranda* rights. A .45 caliber semiautomatic pistol was later recovered from the garage roof.

At that point, Hagemann was unaware that a shooting had just occurred; however, shortly thereafter he monitored a message on the radio that a man had been shot at the intersection of Barry and Pulaski. A second message stated that shots had been fired at Hamlin and Palmer. Hagemann radioed to the squad operator and told him that he had two subjects in custody and that a gun had been recovered.

Defendant and Rivera were then taken to the police station. Hagemann asked defendant whether he was a member of a gang, and defendant admitted that he was a member of the Latin Disciples. Hagemann also asked defendant whether he had any tattoos. On the arrest report, Hagemann wrote: "Self-admitted Latin Disciple tattoted [*sic*]." Hagemann recorded defendant's height as 5 feet 11 inches, and that he weighed 195 pounds.

Officer Whalen testified to substantially the same evidence rendered by Hagemann. Whalen made an in-court identification of defendant and Rivera, and stated that defendant held the handgun. When the crime lab personnel arrived at the scene of the arrest, Whalen pointed to the location on the garage roof where defendant threw the gun.

Doctor Eupil Choi of the Cook County medical examiner's office performed the autopsy of the deceased. He determined that the cause

of death was a single gunshot wound to the upper back. Doctor Choi opined that it was a distant wound and that it had been fired from a range of at least 20 inches. Based upon his examination, Doctor Choi concluded that the wound was consistent with a bullet fired through a window or some type of intermediary object. Doctor Choi found that the deceased had cocaine metabolite and blood cocaine in his system, and that the drugs could have been ingested four to six hours prior to his death. Further, the deceased had a blood-alcohol content of .06%.

Officer Thomas Bachelder of the Chicago police department crime lab photographed the scene and recovered the handgun. Bachelder also photographed the vehicle, with its broken rear window and bullet holes in the side and trunk of the vehicle. Officer Stanley Mocaldo of the crime lab latent fingerprint unit examined the latent prints that had been taken from the pistol and ammunition clip found on the roof of the garage. Mocaldo found one left thumb print suitable for comparison on the handgun. He concluded that the print belonged to Francisco Santiago, whom Rivera implicated after trial as the shooter in the incident. He further testified that certain people, characterized as nonsecretors, do not leave fingerprints. Relatedly, Officer Ernest Warner of the crime lab performed the ballistics tests on the recovered handgun. He conclusively determined that the bullet which killed the deceased was fired from the gun recovered on the garage roof.

Julie Gardi testified for defendant that she was 15 years old and had been defendant's friend for two years. Around 9:30 p.m. on August 24, 1989, she was at Mozart School together with her friends Elaina, Corey, and defendant. The group sat on a bench talking for about 20 minutes, and then Elaina, Corey and the witness headed toward Gardi's home. Defendant remained in the park. Prior to arriving home, Gardi heard three or four gunshots.

Gardi was acquainted with Santiago, whom she described as "skinny" with black hair. Gardi identified Santiago's gray Toyota in a photograph of the scene of the shooting. On cross-examination, Gardi stated that she knew defendant was in the Latin Disciples street gang. Although Gardi was aware that someone had been shot and that defendant was charged with the offense for more than one year, she did not tell anyone that she had been with defendant on the night of the shooting until two weeks prior to trial.

Defendant also called Officer Goodwin to elicit details of the original descriptions of the offenders given by Siudut. In his arrest report, Goodwin indicated that Siudut described the first offender as a male Hispanic, approximately 21 years old, 5 feet 7 inches, 150 pounds, with black hair and an olive complexion, and that he was wearing a

white cap and blue jeans. The second offender was described as an Hispanic male wearing a white tee-shirt with blue jeans, 5 feet 9 inches tall, 160 pounds, black hair with an olive complexion. The report does not distinguish as to which description pertains to the shooter. Goodwin recalled that one of the assailants wore a Bears training jacket.

Defendant, age 20, testified that at around 9:30 p.m. on August 24, 1989, he was in the Mozart Park school yard. At first he was playing basketball, and then he joined in a conversation with Gardi, Elaina and Corey. After approximately one-half hour, the others left the park. Defendant remained there alone, and then proceeded across the school grounds toward Hamlin. Before he reached the exit, he heard gunshots. As he turned the corner towards Palmer, he saw people running. Upon reaching Palmer, he saw Rivera and Santiago. Defendant became confused and began running toward Avers. He saw the squad car approach and Rivera and Santiago run into a gangway. Defendant entered the gangway and told Rivera and Santiago what had happened. They urged him to follow them out of the gangway, and he complied. As he exited the gangway, he saw a police officer, who ordered him to stop. Rivera and defendant stopped; however, Santiago continued running. Defendant was told to sit on the grass and was subsequently arrested.

The police placed him inside the squad car and drove to Pulaski and Fullerton. Defendant stated that a man with blood on his shirt, whom he subsequently identified as Siudut, told the police that defendant was not the man involved in the incident. They then drove to Palmer and Hamlin, where Siudut again told the police that defendant was not the assailant. Defendant denied shooting any bullets at a vehicle in which Siudut was a passenger, and stated that he did not have a handgun in his possession. On cross-examination, defendant stated that he was a member of the Latin Disciples at the time of the shooting and that Rivera and Santiago were members as well.

The State presented several rebuttal witnesses. Hagemann testified that Officers Allen Wittenberg and Roy Rodriguez drove defendant from the location where he was arrested. Hagemann stated that during his pursuit of defendant and Rivera in the gangway, he did not see a third man. Wittenberg testified that he drove defendant to the police station after his arrest, and that he made no stops en route as described by defendant. Officer William Dorsch testified that he had a conversation with defendant after he arrived at the police station and had been advised of his *Miranda* rights. Defendant told Dorsch that

he had been playing basketball with his friends at the school, and that he had heard shots during the game. He thought the shots were directed towards him, and he ran away. Defendant denied having a handgun on the night of the incident.

The jury found defendant guilty of murder, attempted murder, aggravated battery, and armed violence. Rivera was acquitted of the charges filed against him. Two months after his acquittal, Rivera submitted an affidavit stating that on the evening in question, he was present with Santiago at the corner of Hamlin and Palmer when two men in a car drove up looking to buy marijuana. Santiago began a conversation with the driver of the car, which evolved into an argument. Santiago walked away and returned a short time later with a gun in his right hand. Rivera saw Santiago point the gun in the direction of the car and fire shots as the car drove off. Rivera stated that Santiago was the only person who fired shots at the car. Rivera described Santiago as 5 feet 7 inches tall and weighing about 130 pounds.

On appeal, defendant first contends that he was not proved guilty beyond a reasonable doubt. Specifically, defendant attacks the eyewitness testimony of Siudut as inherently unreliable because he had used intoxicants; he did not have an ample opportunity to observe defendant; and his identification of defendant is impeached by the great disparity between the description of the shooter as given by Officer Goodwin and defendant's appearance. He further contends that the true offender was Santiago and that doubts exist as to the accuracy of the police officers' testimony.

It is well established that a criminal conviction will not be set aside on insufficiency of evidence grounds unless evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Kargol* (1991), 219 Ill. App. 3d 66, 578 N.E.2d 1356.) As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)

■ We focus our attention first upon defendant's contentions challenging the credibility of Siudut. The testimony of Doctor Choi established that the deceased had used cocaine and alcohol. Siudut admitted that he had drunk beer on the night of the shooting and that he and the deceased sought to purchase marijuana. From these cir-

cumstances, defendant attempts to draw an inference that Siudut's identification testimony must be inherently unreliable.

Defendant cites *People v. Pellegrino* (1964), 30 Ill. 2d 331, 196 N.E.2d 670, and *People v. McKibben* (1974), 24 Ill. App. 3d 692, 321 N.E.2d 362, for the proposition that the testimony of a narcotics addict is subject to suspicion. However, the record does not indicate that Siudut was a narcotics addict, nor can we infer that simply because he consumed alcohol on the evening of the murder his testimony is unworthy of belief. The law commits to the trier of fact the determination of credibility of witnesses, weight to be given their testimony, and inferences to be drawn from the evidence. *People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179.

We next address defendant's challenge to Siudut's identification testimony. Circumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317; *People v. Cohoon* (1984), 104 Ill. 2d 295, 472 N.E.2d 403; *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.

Application of the aforementioned principles to this case supports Siudut's identification. Siudut testified that the defendant and Rivera approached the car, and a conversation ensued about buying marijuana. Defendant stood at very close range as he aimed the handgun and threatened to kill him. Siudut also identified defendant and Rivera later that same evening in a lineup and did not waver in that identification. Identification of the accused by a single eyewitness is sufficient to sustain a conviction, provided that the witness viewed the accused under circumstances permitting a positive identification. (*People v. Neither* (1988), 166 Ill. App. 3d 896, 520 N.E.2d 1247.) We find that Siudut had ample opportunity to identify defendant in a manner sufficient to sustain the conviction.

Defendant also contends that Officer Goodwin's description of "assailant one" as the shooter does not comport with defendant's physical description. Careful review of the record, however, reveals that during redirect examination, it was established that the arrest report does not distinguish between a first and second offender. Moreover, minor discrepancies in testimony do not render it unworthy of belief and only affect its weight. (*People v. Marron* (1986), 145 Ill. App. 3d 975, 496 N.E.2d 297.) Where discrepancies in the testimony

of a witness relate only to collateral matters, they need not render the testimony of the witness on material issues improbable or incredible. *People v. Brown* (1986), 150 Ill. App. 3d 535, 501 N.E.2d 1347.

Defendant points out that Santiago's thumbprint was found on the gun, which the State acknowledges. Defendant further maintains that the officers' testimony as to whether defendant possessed the gun is also suspect because Siudut had an uncle who was employed by the police department.

Again, issues of credibility such as these are most properly addressed by the trier of fact. In view of the positive identification provided by Siudut, and Hagemann's testimony that he apprehended defendant after a foot chase during which defendant was seen carrying a handgun which was recovered from the garage roof and which later proved to be the murder weapon, we find that defendant was proved guilty beyond a reasonable doubt.

Defendant next asserts that the trial court erred in denying his motion for a new trial. Specifically, defendant asserts that the affidavit of Rivera implicating Santiago constituted new evidence which could not have been presented at the first trial.

In order to warrant a new trial, newly discovered evidence must be of such conclusive character that it probably will change the outcome of the trial, must be material to the issue but not merely cumulative, and must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. *People v. Geneva* (1990), 196 Ill. App. 3d 1017, 554 N.E.2d 556.

As support for his position, defendant relies upon *People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398. In that case, our supreme court determined that a different result appeared probable if the trier of fact would have considered the post-trial testimony of defendant's codefendants (after their convictions) that defendant was not present at the time of the attack. The court determined that the trial court had abused its discretion in denying defendant's motion for a new trial on the basis of such newly discovered testimony, where the trier of fact would have to balance testimony of a single witness placing the defendant at the scene of the crime, against defendant's own denial of his presence, testimony of his parents that he was with them at the time, and the testimony of five other persons who claimed that defendant was not present.

■ We find, however, that the present case is factually distinguishable from *Molstad*. Although both matters had testimony of a single eyewitness, the case against defendant here was much stronger

in view of the fact that Officers Hagemann and Whalen apprehended defendant after a foot chase shortly after the shooting occurred, and where defendant was identified as holding a handgun. Too, the murder weapon, which defendant threw onto the roof, was recovered. The record also reveals that Rivera's affidavit implicating Santiago was not submitted until two months after the trial had concluded. In *Molstad*, the affidavits were prepared after the guilty verdict and before the sentencing hearing, thereby demonstrating defendant's due diligence in presenting the court with the newly discovered evidence.

Defendant next contends that the State made improper references to his gang affiliation during closing arguments, thereby prejudicing the jury against him. Defendant asserts that the shooting was not gang related; as such, any reference to his gang involvement was impermissible under the circumstances.

At trial, Siudut testified that when he first encountered defendant and Rivera, they flashed gang symbols at him. Comments were also made during closing argument about the prominence of gangs in the neighborhood where the murder occurred. However, upon review of the record, we find that none of the comments complained of by defendant were objected to at trial on the basis now raised by defendant. It is well established that failure to raise objections at trial results in waiver of the issue upon review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) While the plain error rule can be invoked in instances where the error complained of is so egregious that it deprives defendant of a fair trial, we do not find that the circumstances of this case warrant its application.

Defendant also contends that the State violated Supreme Court Rule 412 (134 Ill. 2d R. 412), when it failed to disclose an oral statement made by defendant in its answer to discovery. In particular, defendant claims that the State failed to disclose an oral statement made by defendant after his arrest that he was a member of the Latin Disciples.

Supreme Court Rule 412 provides that the State shall, upon written motion of defense counsel, disclose any written or recorded statements and the substance of any oral statements made by the accused. The arrest report in question states, "self-admitted Latin Disciple tattoted [*sic*]."

The principle behind pretrial discovery is to afford the defense an adequate opportunity to investigate and to alleviate untimely interruptions at trial occasioned by disclosures of statements first made at trial. (*People v. Moses* (1957), 11 Ill. 2d 84, 142 N.E.2d 1.) Supreme Court Rule 412 was adopted to prevent surprise and prejudice to the

accused. (*People v. Stewart* (1980), 84 Ill. App. 3d 855, 406 N.E.2d 53.) Technical compliance with the rule may be excused where the defendant had access to the statements. (*People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865; *People v. Miller* (1989), 190 Ill. App. 3d 981, 548 N.E.2d 1.) When the substance of a statement is contained in a police report that has been previously furnished to the defense pursuant to discovery, the purpose of the rule has been satisfied. *People v. Miller*, 190 Ill. App. 3d 981, 548 N.E.2d 1; *People v. Howard* (1984), 121 Ill. App. 3d 938, 460 N.E.2d 432; *People v. Herrera* (1981), 96 Ill. App. 3d 851, 422 N.E.2d 95.

██ A fair reading of the arrest report indicates that defendant had been adequately apprised by the State that he had made certain admissions to the arresting officer concerning his gang affiliation. The notations concerning defendant's gang tattoos reinforced this point. We believe that one could fairly conclude from the language contained in the police report that defendant could anticipate questions concerning such admissions. Therefore, we dismiss defendant's contentions that the State failed to adequately comply with discovery.

The next issue raised by defendant asserts that the trial judge erred when he refused to instruct the jury that the testimony of the police officers should be judged in the same manner as any other witness. The court did tender Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981), a general instruction concerning the credibility of witnesses, taking into consideration any interest, bias, or prejudice a witness may have. However, defendant urges that such an instruction is insufficient under the circumstances because the State's case relied heavily upon the police testimony.

██ The decision whether to give a tendered non-Illinois Pattern Jury Instruction (non-IPI) rests within the sound discretion of the trial court, and the trial court may properly refuse a non-IPI credibility instruction where an Illinois Pattern Jury Instruction is given which adequately addresses the same issue. (*People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 550 N.E.2d 1011.) In this case, we do not believe that the trial judge abused his discretion in refusing to tender defendant's proffered instruction. Nor do we believe that the fact Siudut's uncle was employed by the police department required such an instruction.

██ Finally, defendant argues that the testimony adduced at trial concerning the fact that certain individuals are not secretors and would therefore not leave fingerprints unfairly implied that defendant was a nonsecretor. However, defendant's failure to object at trial to

this testimony results in waiver of this issue upon review. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.