NOTICE
This Order was filed under
Supreme Court Rule 23 and is not
precedent except in the limited
circumstances allowed under Rule
23(e)(1).

2021 IL App (4th) 190045-U

NO. 4-19-0045

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DOMINIQUE D. SMITH, | ) | No. 15CF1601 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:     The appellate court affirmed, holding the trial court did not err in trying defendant *in absentia*; the trial court did not err when restoring defendant to fitness; the trial court did not err in not holding a retrospective fitness hearing; the trial court did not err in sentencing; defendant received assistance from counsel of his choice; and defense counsel provided reasonable assistance.

¶ 2     In November 2015, the State charged defendant, Dominique D. Smith, with armed robbery, a Class X felony, subject to a mandatory additional 15 years' incarceration (720 ILCS 5/18-2(a)(2) (West 2014)), alleging "defendant, or someone for whose conduct he was legally responsible, took property, a pizza, from the person or presence of Yang Lu by threatening the imminent use of force, and *** defendant or one for whose conduct he was legally responsible carried on or about his/her person a firearm, namely: a handgun." After the defendant failed to appear at consecutive pretrial hearings, the State moved to try him *in absentia*, which the trial court granted. The matter proceeded to jury trial without defendant in

January 2017, where the jury found him guilty. Defendant reappeared for sentencing, but, in April 2017, his counsel expressed doubts as to defendant's fitness and moved for appointment of a psychiatrist to examine defendant. Following the examination, the trial court found defendant unfit for sentencing and ordered he be placed in the custody of the Illinois Department of Human Services (DHS).

¶ 3　　　　Once defendant was restored to fitness, in November 2018, he filed a "Motion for Acquittals or in the Alternative Motion for a New Trial." Following a hearing, the trial court denied defendant's posttrial motion. In January 2019, the trial court sentenced defendant to 25 years in the Illinois Department of Corrections (DOC) followed by 3 years' mandatory supervised release (MSR). Defendant filed a motion to reconsider the sentence, which the trial court denied.

¶ 4　　　　On appeal, defendant's argument is sixfold: (1) the trial court erred in proceeding to trial *in absentia*; (2) the trial court erred in twice restoring defendant to fitness based upon stipulations from the parties; (3) once defendant was found unfit for sentencing, the trial court erred in not holding a retroactive fitness hearing to determine whether defendant was fit to stand trial; (4) the trial court abused its discretion at sentencing by committing two errors, namely, failing to give due consideration to defendant's youth and rehabilitative potential and using an inherent factor in the offense as an aggravating factor; (5) defendant was denied his sixth amendment right to counsel of his choice; and (6) defendant received ineffective assistance of counsel. We disagree and affirm the trial court's judgment.

¶ 5　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　In November 2015, the State charged defendant with armed robbery, a Class X felony, subject to mandatory additional 15 years' incarceration (720 ILCS 5/18-2(a)(2) (West

- 2 -

2014)), alleging "defendant, or someone for whose conduct he was legally responsible, took property, a pizza, from the person or presence of Yang Lu by threatening the imminent use of force, and *** defendant or one for whose conduct he was legally responsible carried on or about his/her person a firearm, namely: a handgun." The facts of this case are more fully set forth in *People v. Gaines*, 2018 IL App (4th) 160442-U, his codefendant's case. As defendant's case progressed toward trial, he alternated between being represented by the public defender and by privately retained counsel. Those changes in counsel, along with other reasons, caused the defense to file several motions for continuances, which the trial court granted. In August 2016, defendant posted a $10,000 bond and was released from the Champaign County jail.

¶ 7        In October 2016, once the trial court granted the public defender's motion to continue and set the matter for a final pretrial hearing, defendant's uncle, Benny Smith (Smith), hired Harvey Welch as defendant's third privately retained attorney. Smith represented to Welch that the trial court granted a final continuance, and the trial would commence in a matter of days. Welch did not meet defendant the day Benny hired him because Smith claimed defendant was working. Noting the "time crunch" of imminent trial and not wanting to enter the case on the first day of trial, Welch agreed to take the case but wanted to enter his appearance immediately. Consequently, Smith signed a bond assignment to Harvey Welch on defendant's behalf. Welch filed, the same day, a motion to continue on defendant's behalf, contending (1) defendant was not in custody, (2) he had just been retained, and (3) he needed more time to investigate and prepare the case.

¶ 8        On October 11, 2016, Welch followed that up with a formal substitution of attorney form in which the public defender withdrew its appearance and Welch entered his appearance in defendant's case. Defendant did not appear for the pretrial hearing held that same

day. Neither the public defender nor defense counsel knew defendant's whereabouts. Per the State's motion, and over the defense's objection, the trial court issued a bench warrant and bond forfeiture.

¶ 9        On November 14, 2016, the trial court held another pretrial hearing, and defendant again did not appear. Upon the State's renewed request, the trial court entered judgment on the prior order of bond forfeiture. Next, noting defendant was "on his fourth attorney" and that "[t]his case is very old," the State asked that the case "be set for trial *in absentia* because it's pretty clear that [defendant] is not going to return anytime soon." The trial court noted the State's motion for trial *in absentia* but set the matter for another pretrial hearing.

¶ 10        At the December 13, 2016, status hearing, defendant did not appear. When the trial court asked about defendant, Welch responded: "he has been missing *** at the last several hearings, and so no, I don't expect him." The trial court noted the State's pending motion for trial *in absentia* and scheduled a hearing for argument the next day.

¶ 11        At the next hearing, the State confirmed, "defendant was in fact admonished as to trial *in absentia*" at his November 2, 2015, arraignment. The State asked the trial court to set a trial date so it could mail proper notice to defendant. The court turned to Welch for argument, who said: "Just show objection for the record, but no, I don't have anything to add." The trial court gave its decision on the record, allowing the State's motion for trial *in absentia* and setting the cause for trial on January 30, 2017. The trial court stated: "Circuit Clerk is directed to send notice to the defendant by certified mail at the last address in the file provided by him." The circuit clerk, via certified mail, sent notice of the January 30, 2017, hearing to defendant's addresses in Memphis, Arkansas, and Urbana, Illinois.

¶ 12        On January 30, 2017, the State and Welch appeared before the trial court and both answered ready for trial. The State "put on the record that the Clerk's office sent certified mailings to the address [defendant] used when he was arrested in Arkansas, as well as the address that was attached to the bond when he was bonded out, so they sent it to two separate places ***." The State argued: "we can proceed *in absentia* since [we] have diligently sent the certified mailings as required by law." Welch responded: "Would you just continue to show my objection, Your Honor, but I have no representations to make regarding [defendant's] whereabouts." The trial court allotted the case for trial, acknowledging the State's evidence of notice and defendant's objection. Welch asked the trial court to "instruct [jurors] that they are not to make any inferences from the fact of [defendant's] absence[.]"

¶ 13        Though neither the trial court nor the parties knew it, at almost this exact moment defendant presented to the emergency room (ER) at Sarah Bush Lincoln Hospital, claiming he relapsed on methamphetamine. Defendant was cooperative. His mood was "fine." He denied suicidal or homicidal ideation. Toxicology screens were negative for drugs or alcohol. When confronted with the toxicology reports, defendant said: "I guess I did not relapse." As the hospital prepared to discharge defendant home, he called his family. After that phone call, defendant began complaining of hot flashes and suicidal thoughts. The doctor noted defendant did not voice those complaints during the examination 10 minutes prior. Defendant refused to say what he talked to his family about, answering inquiries with, "I don't know." Nevertheless, the doctor canceled the planned discharge and admitted defendant for inpatient treatment. Once hospital staff learned that defendant arrived in the ER at the exact time his trial was scheduled to begin, the doctor expressed "some concern for secondary gain." Likewise, the doctor expressed

similar "concerns that [defendant] is trying to avoid his court date and repercussions from missing it."

¶ 14        Defendant's hospitalization was unremarkable. The doctor noted: "When [defendant] is on the unit during the day he is bright of affect and joking laughing and talking with other peers. He only endorses suicidal ideations when talking about legal problems or potential discharge." The hospital's social work staff spoke with defendant over the course of his hospitalization and encouraged "him to begin dealing with some of his legal problems." The social worker offered to make calls to the state's attorney or defense counsel to help defendant resolve his legal problems, but defendant refused to sign any releases. He also refused to make any phone calls related to his legal charges. The hospital discharged defendant on February 2, 2017.

¶ 15        Meanwhile, back at the courthouse, during its case-in-chief, the State presented evidence of the armed robbery through testimony from the victim, testimony from responding police officers, various photographs, and a video of defendant's police interview where he described his encounter with the victim and admitted holding the gun. The defense presented no evidence but moved for a directed verdict, which the trial court denied. While the jury deliberated, the trial court then took this opportunity to note on the record that after the jury left the courtroom a man who identified himself as defendant's uncle approached the bench and gave the court a package of documents. The court informed the parties it put the documents in the court file and it did not "intend to do anything else with this information."

¶ 16        After deliberating for less than 30 minutes, the jury found defendant guilty as charged. The trial court, therefore, "enter[ed] a judgment on the verdicts of guilty for the People and against the defendant on the offense of armed robbery, and on the special allegation of

committing the offense while armed with a firearm." The trial court directed court services "to conduct a presentence investigation and prepare a report" and scheduled a sentencing hearing for March 2017.

¶ 17     Meanwhile, on February 9, 2017, defendant presented to court services for the presentence investigation and interview. On February 13, 2017, Welch filed a posttrial motion seeking to vacate defendant's conviction on several grounds, including, among other claims, the trial court erred in allowing defendant to be tried *in absentia*.

¶ 18     Defendant appeared at the March 14, 2017, sentencing hearing. When the trial court called defendant's name and case number, defendant answered, "Yes, sir." The court directed defendant, "Do you want to come up here and join your attorney, sir?" Defendant sat next to Welch at counsel's table. When the court asked the State to respond to the defense's posttrial motion, counsel answered: "I'm ready to proceed, your Honor, but given that the defendant has finally arrived, I don't know if defense counsel wants to proceed." Welch stated: "Your Honor, I would ask for a short continuance on the post-trial motion, and the sentencing if we reach that." The trial court granted a continuance and rescheduled the hearing. The following exchange then occurred:

"MR. LARSON [(STATE'S ATTORNEY)]: Your Honor, the defendant was convicted of a Class X felony and there's a no-bond warrant, so I'd ask he be remanded into custody.

THE COURT: Any argument you want to make on that, Mr. Welch?

MR. WELCH: Well, your Honor, I would just object. That's an accurate recitation of where, where we are from the procedural posture, but I would object.

THE COURT: Any representations you can make as to where the defendant was during the trial?

MR. WELCH: No, not at this time.

THE COURT: All right. Then I will show your objection for the record, but it's overruled. State's motion for service of no-bond warrant and remand of the defendant's allowed. You'll need to go with the deputy, sir.

THE DEFENDANT: Yes, sir, thank you."

At this point, an unidentified male interjected himself into the proceedings, asking to give documents to the trial court. When the trial court asked, "[W]ho are you, sir?" the man answered:

"UNIDENTIFIED MALE SPEAKER: I'm the uncle. I had the letter from the Supreme Court, which we filed. He never was his attorney, and he—he filed two contracts to take the bond—bond money from my mother, *** and he wrote another contract and said I'll show you all for 3700. *** He never signed for him, never seen this man as attorney. He's been in the state institution in Charleston. *** [W]e're going to appeal it, because he don't want to appeal the case. Number one, he never was hired by him.

***

THE COURT: All right. I'm going to suggest that whatever documents you've got from the court you turn over to Mr. Welch, or copies of those. And if there are grounds for motions, he can file that motion.

THE DEFENDANT: Why would I turn it over to an attorney that's not my attorney.

UNIDENTIFIED MALE SPEAKER: But what if he's— he's not his attorney.

THE DEFENDANT: I never hired him. I don't even—this is my first time seeing this man.

THE COURT: He is—he's the attorney of record in this case, sir. There are lots of ways that you can bring up issues concerning his performance, but this is not one of them. All right, you need to go with the bailiff.

THE DEFENDANT: Okay."

¶ 19     On March 21, 2017, the parties appeared before the trial court for a status hearing. Welch requested another continuance on the posttrial motion, saying: "I met with [defendant]. There's some other issues that have come up so I'm asking for some more time." Since the State did not object, the trial court set the matter for a hearing on the defense's posttrial motion. Defendant then raised his hand and requested a public defender. He said he did not hire Welch as his attorney. Welch informed the trial court he would talk with defendant and "prepare the necessary paperwork." On March 24, 2017, Welch filed a motion to withdraw as counsel, saying he began representing defendant on October 7, 2016, but "irreconcilable differences have arisen

- 9 -

between the defendant and his attorney" and "the defendant wants new counsel." At the March 31, 2017, hearing, the trial court allowed Welch's motion to withdraw and reappointed the public defender to the case.

¶ 20    While housed in the Champaign County jail on April 13, 2017, defendant threw a lunch tray at a correctional officer and then began hitting him. Defendant then began hitting and kicking other officers who came to help subdue him. The State eventually charged him under a new case number and that case proceeded concurrently with the underlying armed robbery matter.

¶ 21    On April 27, 2017, defense counsel filed a "Motion for Appointment of Psychiatrist" and accompanying affidavit, affirming counsel had met with and spoke to defendant and "has a bona fide doubt as to the defendant's fitness and sanity in that he cannot cooperate with his attorney and cannot understand the proceedings." The trial court granted the motion the same day. Dr. Albert Lo, M.D., evaluated defendant and found him "too uncooperative to fully assess." Dr. Lo, nevertheless, diagnosed defendant with probable unspecified psychotic disorder, rule out malingering, history of opiate and cocaine use, and probable antisocial personality disorder. Ultimately, Dr. Lo opined defendant was unfit. On July 7, 2017, the trial court issued an order finding defendant not fit to plead, stand trial, or be sentenced. The trial court's order placed defendant in DHS's custody, noting, "there is a probability that the defendant will attain fitness within one (1) year."

¶ 22    DHS issued a report dated January 31, 2018, detailing defendant's diagnoses and his response to treatment. In the report, Dr. Terrence Casey, M.D., opined defendant was fit to stand trial or be sentenced. The parties appeared before the trial court for a fitness hearing on February 7, 2018. The court noted it had a copy of Dr. Casey's report and the prosecutor and

public defender stipulated "to the report's author's expertise in the area of forensic psychiatry." Neither party presented additional evidence. The court stated on the record:

> "Okay. We'll show then the appearances. By stipulation and agreement of the parties the Court will consider the report dated January 31st, 2018, and authored by Doctor Terrence Casey, psychiatrist, as if Doctor Casey had testified in person here in court. Based upon the opinions, facts summarized and conclusions of that report the Court finds that the Defendant has been restored to fitness."

The trial court also made the following docket entry:

> "Chester Mental Health Center report dated January 31, 2018 on file and placed in 2015-CF-1601. [The parties] indicate they have received and reviewed said report. The parties stipulate that the Court may consider the report of Chester Mental Health Center in lieu of testimony. The Court has fully considered all of the reports of Chester Mental Health Center/DHS, including the expert opinions and bases for the opinions, the Court's observations of the defendant in court, and all relevant evidence, including but not limited to evidence of all relevant factors pursuant to 725 ILCS 5/104-16. The court finds that the defendant is fit to stand trial or plead."

The trial court ordered defendant discharged from DHS's custody and remanded to the Sheriff's Department, although defendant was still subject to mental health examinations.

¶ 23    At a March 16, 2018, hearing, defense counsel requested the trial court conduct another fitness hearing, citing a recent psychological examination conducted by Dr. Jeckel. Counsel noted she would "stipulate to [Dr. Jeckel's] expertise and that he would testify with the contents of that—as to the contents of that report, and I would suggest that [defendant] be again found unfit." The State likewise stipulated to Dr. Jeckel's expertise and made no objection to the court finding defendant unfit. Based the expert reports, the court's observations of defendant, and all relevant evidence, the trial court found defendant unfit and ordered him "placed in the custody of [DHS] which shall determine appropriate placement and treatment."

¶ 24    On October 12, 2018, the trial court held a fitness hearing, where it confirmed the parties "received a copy of the report dated August 29th from the Chester Mental Health Service," and both parties stipulated that the court could consider the contents of the report. Neither party presented additional evidence as to defendant's fitness. The trial court then found:

> "Then we will show based on the contents of the report and the stipulation that the Court can consider the report dated August 29, 2018. The Court, considering the contents of the report as if the author of the report were to testify in person to those findings and recommendations, the Court finds that the Defendant has been restored to fitness. Order for restoration of fitness signed and entered."

The trial court likewise made following docket entry:

> "Fitness evaluation/progress reported dated August 23, 2018 received and filed in 2015-CF-1601. *** The parties stipulate that the Court may consider the fitness evaluation/progress report in

lieu of testimony. The Court has fully considered all of the reports

of DHS, including the expert opinions and bases for the opinions,

the Court's observations of the defendant in court, and all relevant

evidence, including but not limited to evidence of all relevant

factors pursuant to 725 ILCS 5/104-16. The court finds that the

defendant is fit to stand trial or plead."

The trial court set a hearing to consider the anticipated posttrial motion from the defense.

¶ 25    In November 2018, defense counsel filed a "Motion for Acquittals or in the Alternative Motion for a New Trial," arguing the trial court committed several errors, but relevant to this appeal, that proceeding to trial *in absentia* over the defense's objection was error. Defendant's motion further alleged his attorney, "Harvey Welch[,] entered his appearance *** without the Defendant's knowledge or consent" and then rendered ineffective assistance of counsel. At a November 20, 2018, hearing, the trial court heard testimony from defendant's trial counsel, Harvey Welch, about Benny Smith hiring him for defendant and his lack of interactions with defendant. The trial court took the matter under advisement but ordered a new presentence investigation in case the court denied defendant's posttrial motion and the case advanced to sentencing.

¶ 26    The trial court ultimately denied defendant's posttrial motion at a January 3, 2019, hearing. Rendering its decision from the bench, the trial court discussed each issue individually. As for the trial *in absentia* issue, the trial court observed how defendant delayed the case by changing attorneys several times and seeking continuances. The trial court also noted how defendant voluntarily admitted himself to the hospital based upon feigned concerns he relapsed on drugs at "almost exactly the same minute that we started jury selection." The trial court

- 13 -

concluded: "So I find that collectively the medical records against the pattern of changing attorneys and the requests for continuances do not overcome the state's prima facie case and I find defendant's failure to appear was willful and it was not error to proceed to trial in absentia." Concerning defendant's allegation he was denied his sixth amendment right to counsel of his choice, the trial court distilled the issue to the following query: "So the question is did [defendant] impliedly or explicitly approve the entry of appearance of Mr. Welch?" The trial court detailed how defendant's uncle "appeared numerous times throughout these proceedings" and attempted to file documents with the court, "including a document purporting to create a short term guardianship of the defendant in the uncle, Benny Smith." The court observed: "I think on those facts it's reasonable to believe that [defendant] had authorized his uncle, Benny Smith, to attempt to hire or actually hire Mr. Welch. He either authorized it or requested it." The court elaborated: "The defendant at no time objected to Mr. Welch's appearance until after the trial was over and he initially appeared—and, when he initially appeared, he seemed to acquiesce in Mr. Welch's continued representation until his uncle started to interject suggestions that the defendant had not actually hired him."

¶ 27        The matter proceeded to a sentencing hearing the next day, January 4, 2019. Before sentencing, the trial court, acknowledging it had overlooked an additional ineffective-assistance-of-counsel claim in defendant's posttrial motion, proceeded to address it. The court found defendant failed to present sufficient evidence he was prejudiced by counsel's deficient performance, meaning defendant did not establish a valid claim for ineffective assistance of counsel. The State presented evidence of defendant's attack on correctional officers in April 2017 as evidence in aggravation. The State asked the trial court to impose a 30-year sentence while the defense countered by asking for the minimum sentence available, 21 years.

The court began by labeling this "a very unusual case" because "[i]t is very, very rare that I see persons before me convicted of such a serious offense that have absolutely no prior criminal history." The trial court "commended" defendant "for getting to his age without any prior criminal convictions, particularly in light of the rough start that he had in life." In reviewing the statutory factors in aggravation, the court observed defendant's crime "threatened serious harm. He received compensation. That's the whole point of an armed robbery. Although, from my recollection of the testimony, the compensation that he received was groceries, which he promptly discarded." The trial court opined, "[s]ome sentence is necessary for a deterrent effect *** [because] gun violence has become an outrageous problem in this community and something needs to be done to tell particularly young males that gun violence will not be tolerated." In reviewing factors in mitigation, the trial court referenced defendant's mental health and noted defendant had "no history of prior delinquency and has led a law-abiding life for his entire life up until the point of this incident." The trial court finally noted defendant apologized for his actions and "accepts some responsibility." In announcing the sentence, the trial court stated:

> "The question ultimately then becomes where within the range of 21 to 45 years the final sentence should be and I think, considering all of the factors in aggravation, particularly the deterrent effect, I believe a sentence of 25 years is the most appropriate sentence in this case, so that will be the sentence of court."

Defendant filed a motion to reconsider the sentence, alleging the trial court gave too much weight to deterrence and insufficient weight to factors in mitigation, including defendant's rehabilitative potential. The trial court denied the motion.

¶ 28        This appealed followed.

¶ 29                                II. ANALYSIS

¶ 30        Defendant challenges the trial court's order on six grounds. First, he argues the trial court erred in trying defendant *in absentia*, alleging the record does not show he heard and understood the *absentia* warnings and, alternatively, he did not willfully absent himself from trial. Second, he argues the trial court erred in twice restoring him to fitness based solely on stipulations from the parties. Third, he argues the trial court erred in failing to conduct a hearing inquiring into defendant's fitness to stand trial after defendant was found unfit for sentencing. Fourth, the trial court abused its discretion in sentencing defendant—specifically, the court placed too little weight on defendant's youth and rehabilitative potential and it considered a factor inherent in the offense as an aggravating factor. Fifth, defendant argues he was denied his sixth amendment right to the counsel of his choice. Sixth, he argues trial counsel rendered ineffective assistance, specifically counsel failed to inform the court about defendant's whereabouts as part of the objection to trial *in absentia*. Taking each argument in turn, we disagree and affirm the trial court's order.

¶ 31                            A. Trial *in Absentia*

¶ 32        Criminal defendants enjoy a "constitutional right to be present at all stages of trial." *People v. Smith*, 188 Ill. 2d 335, 340, 721 N.E.2d 553, 557 (1999) (citing U.S. Const., amend. VI; Ill. Const. 1970, art. 1, § 8). But the right to be present carries with it the concomitant responsibility to attend all court proceedings, " 'especially where [the] [defendant] has been released on bail.' " *Smith*, 188 Ill. 2d at 340 (quoting *People v. Steenbergen*, 31 Ill. 2d 615, 618, 203 N.E.2d 404, 406 (1964)). Accordingly, defendants who voluntarily absent themselves from trial waive their constitutional right to be present. *Smith*, 188 Ill. 2d at 341. Though disfavored

and therefore limited to circumscribed situations, trial courts may proceed with trials without defendants present—trials *in absentia*. Illinois's Code of Criminal Procedure of 1963 (Code) codifies "the circumstances in which a trial *in absentia* may be conducted." *Smith*, 188 Ill. 2d at 341. The Code first requires the trial court to admonish defendants that failure to appear at trial could result in the trial proceeding in the defendants' absence. 725 ILCS 5/113-4(e) (West 2016). The Code next outlines the showing necessary for trial *in absentia*:

> "When a defendant after arrest and an initial court appearance for a non-capital felony or a misdemeanor, fails to appear for trial, at the request of the State and after the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding trial, the court may commence trial in the absence of the defendant." 725 ILCS 5/115-4.1(a) (West 2016).

Only when these two statutory requirements are met should a trial court proceed with trial *in absentia*.

¶ 33                                    1. Absentia *Admonishments*

¶ 34          "[A] defendant in Illinois has a statutory right under section 113-4(e) of the Code to be admonished as to the possible consequences of failing to appear in court when required." *People v. Phillips*, 242 Ill. 2d 189, 195, 950 N.E.2d 1126, 1130 (2011). Per the statute governing pleas:

> "If a defendant pleads not guilty, the court shall advise him at that time or at any later court date on which he is present that if he escapes from custody or is released on bond and fails to appear

in court when required by the court that his failure to appear would constitute a waiver of his right to confront the witnesses against him and trial could proceed in his absence." 725 ILCS 5/113-4(e) (West 2016).

Written warnings on various forms, like bond slips, informing defendants they could be tried *in absentia* for failing to appear cannot substitute for oral admonishments from the court. Indeed, our supreme court previously explained "section 113-4(e) unambiguously requires the trial court to admonish a defendant in open court." *Phillips*, 242 Ill. 2d at 199. The *Phillips* court then went on to hold that "reversible error occurs when the trial court fails to admonish a defendant as required under section 113-4(e) at the time of his arraignment, or at a later court date that he is present." *Phillips*, 242 Ill. 2d at 201.

¶ 35 Defendant concedes he received section 113-4(e) admonishments at his November 2, 2015, arraignment. He acknowledges he was in the courtroom when the trial court gave an *en masse* admonishment, stating:

"If your case is set for trial and if you did not appear at your trial, trial could proceed in your absence. You would then give up your right to confront and cross-examine witnesses and your right to testify. You could be found guilty. You could be sentenced in your absence. Please make sure you understand when you are required to be in court.

Thanks for your attention."

Indeed, the record shows defendant was arraigned following this admonishment. Defendant does not quibble with the *en masse* admonition, and rightly so. This court has approved of trial courts

giving a one-time admonition of rights to a group of defendants assembled in the courtroom, calling the general admonition "a useful tool in the expedition of judicial business." *People v. Penermon*, 108 Ill. App. 3d 73, 75, 438 N.E.2d 946, 947 (1982). Defendant argues "the trial court failed to ensure that [he] heard the *absentia* admonitions or that he understood them." But he fails to direct us to an on-point case that says after giving *en masse absentia* admonishments the trial court must address defendants individually to verify they understood those warnings. While defendant cites *Phillips* to support his claim that "the court must also verify that the defendant understands those rights and obligations," the case does not state such a rule. The *Phillips* court held a trial court must provide *absentia* admonishments in open court. In *dicta*, the supreme court expressed its belief that oral *absentia* admonishments are preferable to written warnings because they "provide[ ] the trial court with an opportunity to *** verify that [the defendant] understands this important right and duty." *Phillips*, 242 Ill. 2d at 200. But *Phillips* does not address *en masse absentia* admonishments and does not require a court to follow up with defendants individually to ensure they understand their right and obligation to be present. Defendant also cites *People v. Stevenson*, 2020 IL App (4th) 180143, ¶ 17, 156 N.E.3d 1275, for the proposition that a trial court must address defendants individually following an *en masse absentia* admonishment. But, again, the *Stevenson* court did not impose such an obligation. *Stevenson* did not address *absentia* admonishments, but, rather, it discussed the pitfalls of *en masse* admonishments generally and gave examples of how trial courts might avoid those pitfalls. *Stevenson*, 2020 IL App (4th) 180143, ¶ 17. Coupling the *dicta* from *Phillips* and *Stevenson* leads us to conclude that while it is certainly best practice for trial courts to verify individually if defendants understand the oral *en masse absentia* admonishments, such individual

follow up is not required. The group admonishment is sufficient. See *Penermon*, 108 Ill. App. 3d at 75.

¶ 36     Although defendant does not claim he did not hear or understand the *absentia* warnings, he implies the trial court was burdened with the responsibility to ensure he did, so we will address that question. Generally, if an ordinary person in the circumstances would understand the information in an admonishment, then the trial court has properly admonished the defendant. *People v. Sutherland*, 128 Ill. App. 3d 415, 419, 470 N.E.2d 1210, 1214 (1984). "[T]he entire record may be considered in determining whether or not there was an understanding by the accused of admonishments." *Sutherland*, 128 Ill. App. 3d at 419. Our review of the record indicates defendant heard and understood the trial *in absentia* admonishment. The transcript shows no interruptions during the group admonishments and the trial court thanked the defendants for their attention. During his arraignment, defendant showed no difficulty in hearing, understanding, or communicating with the trial court, and he did not seem to see the need to inquire of the court regarding the admonishments he had just heard. Furthermore, defendant's uncle submitted documents to the court, which became part of the record, confirming defendant graduated high school and was an honor-roll student. We have no doubt defendant heard and understood the court's warning that failure to appear could result in trial *in absentia*. Since the trial court gave the required statutory admonishment and there is no indication in the record that defendant did not hear or understand it, we find no reversible error.

¶ 37                    2. *Willful Absence*

¶ 38     Defendant also attacks the trial court's decision to proceed with trial *in absentia* or, alternatively, attacks the trial court's decision dismissing his posttrial motion seeking a new

trial, by arguing he rebutted the presumption that he willfully absented himself from trial with evidence proving he was hospitalized during trial. We disagree.

¶ 39        "Willful absence is a prerequisite for trial *in absentia*." *Smith*, 188 Ill. 2d at 342. As we noted *supra*, the trial court may proceed with trial *in absentia* when "the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding trial." 725 ILCS 5/115-4.1(a) (West 2016). The State makes "a *prima facie* case of a defendant's willful absence within the meaning of that statutory provision" when it shows "the defendant: (1) was advised of the trial date; (2) was advised that failure to appear could result in trial *in absentia*; and (3) did not appear for trial when the case was called." *Smith*, 188 Ill. 2d at 342-43. Defendant does not challenge the State's *prima facie* showing because the record confirms defendant received notice of the trial date, he received the required *absentia* warnings, and he did not appear for trial. Defendant, instead, contends he should have been granted a new trial because, pursuant to the Code, he rebutted the State's *prima facie* case when he "establish[ed] that his failure to appear in court was *both* without his fault *and* due to circumstances beyond his control." (Emphases added.) 725 ILCS 5/115-4.1(e) (West 2016). "The trial court's denial of a new trial to a defendant convicted *in absentia* will not be reversed unless a manifest abuse of discretion is shown." *People v. Reyna*, 289 Ill. App. 3d 835, 838, 682 N.E.2d 1191, 1193 (1997).

¶ 40        Citing *People v. Johnson*, 293 Ill. App. 3d 915, 689 N.E.2d 179 (1997), defendant contends that since he was hospitalized during the trial, he did not willfully absent himself from the proceedings. Defendant directs our attention to the *Johnson* court's observation that "hospitalization, at least in the absence of a voluntary act like a suicide attempt, shows the defendant's absence [at trial] is not voluntary." *Johnson*, 293 Ill. App. 3d at 919. The *Johnson*

court ultimately held that the defendant's hospitalization in a cardiac unit did not amount to a voluntary absence from trial and reversed the trial court's decision to proceed with a trial *in absentia*. *Johnson*, 293 Ill. App. 3d at 920.

¶ 41 The record here does in fact confirm that defendant presented to Sarah Bush Lincoln Hospital in Charleston, Illinois, at 1:30 p.m. on January 30, 2017—the exact date and time his trial was scheduled to begin in Urbana. But unlike *Johnson*, the record does not show defendant's absence from trial was involuntary; or, in the words of the statute, the record does not show "his failure to appear in court was both without his fault and due to circumstances beyond his control." 725 ILCS 5/115-4.1(e) (West 2016).

¶ 42 The convenient timing of defendant's hospitalization did not escape the trial court's attention, and it does not escape ours. Defendant, an Urbana resident scheduled to appear at the courthouse in Urbana, drove an hour to the ER at Sara Bush Lincoln Hospital in Charleston, Illinois, for treatment of a drug relapse when he could have gone to an ER in Champaign-Urbana. He presented to the hospital in Charleston just as trial commenced in Urbana, causing the trial court to observe that "defendant's admission to Sarah Bush Lincoln *** was almost exactly the same minute that we started jury selection." Though defendant claimed he relapsed on methamphetamine, a toxicology screen was negative. The medical records report defendant described his mood as good until he talked to his family on the phone. Only then did he claim to be suicidal. His medical records reveal defendant was bright, friendly, laughing, and joking when in the hospital and would only endorse suicidal ideation when hospital staff talked to him about his legal problems or discharging him home. Similarly, the record shows defendant would not cooperate with hospital staff's efforts to help him contact someone about his ongoing trial. He refused to sign releases and refused to make any phone calls related to his legal issues.

Defendant's behavior and comments led the hospital staff to question whether defendant was malingering or using the hospitalization for "secondary gain."

¶ 43　　　　　Based on this information from defendant's medical records—which he presented to prove that his hospitalization made his absence at trial involuntary—the trial court concluded defendant did "not overcome the [S]tate's *prima facie* case and [it found] defendant's failure to appear was willful." We see no manifest abuse of discretion in these conclusions. See *Reyna*, 289 Ill. App. 3d at 838. It is in no way unreasonable or arbitrary to read these records and infer defendant's hospitalization was not only voluntary but a planned ruse to avoid trial. Defendant traveled to another town and lied about relapsing on methamphetamine. Once confronted with his lie, faced with discharge, and talking with family on the phone, defendant began endorsing suicidal thoughts. Upon admission to the hospital, defendant refused to allow anyone to contact the court, the state's attorney, or his own defense counsel. Given these voluntary acts, and the opinions from the hospital staff, we cannot say defendant was without fault for his absence or that his absence was due to circumstances beyond his control. If anything, the medical records show defendant controlled the circumstances to ensure he missed trial. The trial court, therefore, did not manifestly abuse its discretion in denying defendant's motion for a new trial. See *Reyna*, 289 Ill. App. 3d at 838.

¶ 44　　　　　　　　　　B. Restoring Defendant to Fitness

¶ 45　　　　　Defendant argues the trial court erred in twice restoring him to fitness based solely on stipulations from the parties. Defendant contends the trial court erroneously relied on the stipulations rather than making a record or providing factual bases for its findings, thereby abdicating its duty "to conduct a constitutionally acceptable fitness hearing." We observe, as does the State, that defendant failed to raise this issue during the fitness hearings or in his motion

for a new trial. However, the plain-error doctrine allows us to review defendant's claim because "[f]itness for trial *** involves a fundamental right." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28, 34 N.E.3d 560.

¶ 46            "Due process bars the prosecution of a defendant who is unfit to stand trial." *People v. Shaw*, 2015 IL App (4th) 140106, ¶ 24, 44 N.E.3d 665. After a defendant undergoes a fitness examination, the trial court must conduct a fitness hearing within 45 days of receiving the examiner's final report. *Shaw*, 2015 IL App (4th) 140106, ¶ 25 (quoting 725 ILCS 5/104-16(a) (West 2012)). At the fitness hearing, the trial court must decide whether the defendant is fit to stand trial or plead based on the evidence before it. 725 ILCS 5/104-16(d) (West 2016). Such evidence may come in the form of stipulations from the parties. Indeed, the parties may stipulate to the content of the examining expert's testimony (*i.e.*, he or she will testify in conformity with the submitted report), but parties cannot stipulate to the examining expert's conclusions (*i.e.*, the defendant is fit or unfit). *People v. Cook*, 2014 IL App (2d) 130545, ¶ 14, 25 N.E.3d 717. Though stipulations are allowed, "[a] trial court's determination of fitness may not be based *solely* upon a stipulation to the existence of psychiatric conclusions or findings." (Emphasis added and internal quotation marks omitted.) *Cook*, 2014 IL App (2d) 130545, ¶ 14. A trial court's fitness determination comports with due process when it considers the parties stipulations along with " 'the court's review of a psychological report and the court's own observations of the defendant.' " *Shaw*, 2015 IL App (4th) 140106, ¶ 26 (quoting *Gipson*, 2015 IL App (1st) 122451, ¶ 30).

¶ 47            The trial court twice restored defendant to fitness following hearings on February 7, 2018, and October 13, 2018. At both hearings, the State and the defense stipulated that the doctor who examined defendant was an expert and would testify consistently with his or her

report. Neither party presented additional evidence. At the February 2018 hearing, the trial court stated:

> "By stipulation and agreement of the parties the Court will consider the report dated January 31st, 2018, and authored by Doctor Terrence Casey, psychiatrist, as if Doctor Casey had testified in person here in court. Based upon the opinions, facts summarized and conclusions of that report the Court finds that the Defendant has been restored to fitness."

The court made a similar statement on the record during the October 2018 hearing, stating:

> "Then we will show based on the contents of the report and the stipulation that the Court can consider the report dated August 29, 2018. The Court, considering the contents of the report as if the author of the report were to testify in person to those findings and recommendations, the Court finds that the Defendant has been restored to fitness. Order for restoration of fitness signed and entered."

Defendant contends these statements show the trial court relied solely on the parties' stipulations when restoring defendant to fitness, which means the hearings did not comport with due process. Defendant bases this argument on the following language found in *Cook*, the trial court "must state on the record the factual basis for its [fitness] finding." *Cook*, 2014 IL App (2d) 130545, ¶ 20. We see two problems with defendant's argument, one legal and one factual.

¶ 48    Taking the legal problem first, we note *Cook*'s mandate that the trial court must state a factual basis on the record for the fitness finding is not supported by authority. The *Cook*

court wrote the statement in effort "to clarify what a court *should do* when presented with a stipulation as to fitness." (Emphasis added.) *Cook*, 2014 IL App (2d) 130545, ¶ 20. Curiously, the *Cook* court transitioned from "should" to "must" in the course of three sentences. But more importantly, the court provided no citation to authority (statutory or case law) as a basis for its belief that trial courts must state on the record a factual basis for the finding. The statute governing fitness hearings requires the trial court base its fitness determination on "the evidence before it," but it imposes no obligation for the court to state a factual basis on the record. 725 ILCS 5/104-16(d) (West 2016). Likewise, the statute governing 90-day hearings for reexamining a defendant's fitness does not require a trial court to state on the record a factual basis for the fitness finding. See 725 ILCS 5/104-20 (West 2016).

¶ 49 Taking the factual problem second, we note the trial court entered lengthy docket entries showing it considered evidence other than the parties' stipulations each time it restored defendant to fitness. At the February 2018 hearing, the trial court's docket entry noted it "fully considered all of the reports from Chester Mental Health Center/DHS, *** the Court's observations of the defendant in court, and all relevant evidence" in restoring defendant to fitness. The court's October 2018 docket entry outlined that the court "fully considered all the reports of DHS, including expert opinions and bases for the opinions, the Court's observations of the defendant in court, and all relevant evidence" before restoring defendant to fitness. In sum, these docket entries confirm the trial court did not restore defendant to fitness based solely on the parties' stipulation. Consequently, we find no constitutional deficiencies in these two fitness hearings. We see the trial court's fitness determination was based, at least in part, " 'on the court's review of a psychological report and the court's own observations of the defendant,' "

thereby satisfying due process. *Shaw*, 2015 IL App (4th) 140106, ¶ 26 (quoting *Gipson*, 2015 IL App (1st) 122451, ¶ 30).

¶ 50                                C. Retrospective Fitness Hearing

¶ 51        Defendant next contends that once the trial court learned he had been hospitalized on a psychiatric ward during trial and was then found unfit for sentencing, the court should have held a fitness hearing to retroactively determine if defendant was fit to stand trial. Put differently, defendant believes his hospitalization and unfitness for sentencing provided a *bona fide* doubt he was fit to stand trial. We observe, again, how defendant also forfeited this issue by failing to raise it during trial, sentencing, or in the posttrial motion. But since a defendant's fitness involves due process, there is a "constitutional dimension" that allows us to address this issue "under the 'plain error doctrine' of Supreme Court Rule 615(a)." *People v. Thomas*, 246 Ill. App. 3d 708, 712, 616 N.E.2d 695, 697 (1993).

¶ 52        "The due process clause prohibits the prosecution of a defendant who is unfit to stand trial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 52, 115 N.E.3d 1148. According to the Code, "[a] defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2016). We presume a defendant is fit (*Westfall*, 2018 IL App (4th) 150997, ¶ 52), but the Code allows the court or any party to raise "[t]he issue of the defendant's fitness *** at any appropriate time before a plea is entered or before, during, or after trial." 725 ILCS 5/104-11(a) (West 2016). In other words, when the court or a party believes a defendant may be unfit, it should request further inquiry into defendant's fitness.

¶ 53        "When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further." 725 ILCS 5/104-11(a) (West 2016). "A

*bona fide* doubt exists when the facts raise a real, substantial, and legitimate doubt regarding a defendant's mental capacity to meaningfully participate in his defense." *Westfall*, 2018 IL App (4th) 150997, ¶ 54. There are three relevant factors for a court to consider when assessing whether a *bona fide* doubt exists as to defendant's fitness. They are: "(1) the defendant's behavior and demeanor, (2) prior medical opinions regarding the defendant's competence, and (3) defense counsel's representations about the defendant's competence." *Westfall*, 2018 IL App (4th) 150997, ¶ 54. If there is no *bona fide* doubt the defendant may be unfit, then no fitness hearing is required. "Whether a *bona fide* doubt exists is an objective and fact-specific inquiry left to the discretion of the trial court." *Westfall*, 2018 IL App (4th) 150997, ¶ 54. We, therefore, review the trial court's *bona fide*-doubt determination for an abuse of that discretion. "A trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would take the view adopted by the trial court." *Westfall*, 2018 IL App (4th) 150997, ¶ 54.

¶ 54    Defendant alleges: "Under the circumstances of this case, there was a *bona fide* doubt as to [defendant's] fitness at the time of his trial, and a hearing should have been held to determine if [he] had been fit at the time of his trial *in absentia*." The circumstances of this case, however, require that any hearing to determine defendant's fitness to stand trial be retrospective because defendant stopped appearing at hearings in October 2016, and no one (not the State, the defense, or the trial court) knew conclusively where defendant was during the January 2017 trial, so there could be no *bona fide* doubt as to his fitness before or during trial. Defendant directs our attention to *People v. Brown*, 131 Ill. App. 3d 859, 864, 476 N.E.2d 469, 473 (1985), which expressly allows for retrospective fitness hearings, providing: "[I]f facts become known to a trial court subsequent to a defendant's conviction on the issue of the defendant's fitness to have stood

trial, it is incumbent upon the trial court to exercise its discretion to determine whether there is a *bona fide* doubt that the defendant was unfit to have stood trial."

¶ 55　　　　The facts that eventually became known to the trial court are these: defendant was hospitalized on the psychiatric unit at Sarah Bush Lincoln Hospital from January 30, 2017, to February 2, 2017; defendant appeared for the presentence interview on February 9, 2017; defendant returned to court for sentencing on March 14, 2017, where he did not display any signs of unfitness; defendant attacked a corrections officer in April 2017; and defendant underwent psychological testing and was found unfit in May 2017. The question before us now is whether these facts, considered as a whole, raised a real, substantial, legitimate doubt about defendant's fitness to stand trial in January 2017, requiring the trial court to hold a retrospective fitness hearing. Taking *Westfall*'s three factors in turn, we answer no.

¶ 56　　　　First, we consider defendant's demeanor and behavior. *Westfall*, 2018 IL App (4th) 150997, ¶ 54. Prior to trial in January 2017, defendant's behavior did not suggest he lacked the mental capacity to understand the proceedings against him or participate in his defense. The same proved true immediately after trial, too. For example, defendant participated in the presentence interview and provided information without any indication he did not understand his situation. Similarly, when defendant appeared in court during March 2017, he displayed he understood the proceedings because he knew he could request a different attorney like he did pretrial. Not until several months after trial did defendant begin to display questionable, even obstreperous, behavior that called into question his mental capacity. By contrast, defendant demonstrated normal behavior and demeanor immediately before and after trial. And even though he was hospitalized during trial, those records reveal defendant exhibited normal behavior in the hospital.

¶ 57    Second, we consider prior medical opinions regarding defendant's competence. *Westfall*, 2018 IL App (4th) 150997, ¶ 54. Defendant underwent two evaluations in summer 2017 and both doctors (Drs. Lo and Jeckel) opined defendant was unfit to stand trial at that time. Nether commented on defendant's fitness to stand trial in January 2017. Dr. Lo opined defendant showed no sign of active mental illness at the time of the armed robbery offense on October 31, 2015. By contrast, Dr. Jeckel could not form an opinion as to defendant's mental state at the time of the offense. Defendant's medical records from Sarah Bush Lincoln Hospital from January 30 to February 2, 2017, likewise, do not raise a legitimate doubt as to defendant's mental capacity to understand the proceedings or assist with his defense at that time. Multiple mental status examinations revealed defendant had normal mood and affect, he was calm and cooperative, his thought processes were linear and goal oriented, his thought content was normal (no mania or psychosis), he displayed fair insight and judgment, and he was alert and oriented. Indeed, Dr. Yost and the hospital staff questioned defendant's motives for the hospitalization because he only complained of suicidal thoughts when someone brought up his ongoing trial or discharging him home. Otherwise, the medical records confirmed defendant displayed normal, appropriate behavior while hospitalized. He seemed to understand exactly what he was doing.

¶ 58    Finally, we consider defense counsel's representations about defendant's competence. *Westfall*, 2018 IL App (4th) 150997, ¶ 54. At a May 1, 2017, hearing, in requesting the trial court to order a psychiatric evaluation of defendant, defense counsel said she "had extreme difficulty in communicating with [defendant]." Counsel explained she did not want to "proceed with the post-trial motion until I can effectively communicate with my client." Tellingly, the record does not show any of defendant's past attorneys raised concerns about defendant's fitness prior to April 2017.

¶ 59 Filtering these facts through *Westfall*'s three factors, we do not find the trial court's decision not to hold a retroactive fitness hearing to be unreasonable, arbitrary, or fanciful. *Westfall*, 2018 IL App (4th) 150997, ¶ 54. The facts before the trial court did not raise a *bona fide* doubt that defendant was unfit to stand trial from January 30, 2017, to February 2, 2017. The very medical records that established defendant was hospitalized during trial also suggested he was feigning a drug relapse and suicidal ideations for the purpose of avoiding trial. Moreover, defendant's behavior and demeanor before and after trial did not indicate he lacked the mental capacity to participate in his defense. Not until April 2017, months after trial, did anyone question defendant's fitness. We see no abuse of discretion in the trial court not holding a retrospective fitness hearing.

¶ 60 D. No Abuse of Discretion in Sentencing

¶ 61 Defendant argues the trial court committed two sentencing errors that warrant remand for resentencing. First, defendant contends the trial court abused its discretion in imposing the 25-year sentence because it failed to fully consider defendant's youth and rehabilitative potential. Second, he contends the trial court erred in considering as a factor in aggravation a factor inherent in the offense of armed robbery, namely compensation. We disagree on both points.

¶ 62 Trial courts enjoy broad discretion in sentencing matters, and we afford those sentencing decisions "great deference." *People v. Coleman*, 166 Ill. 2d 247, 258, 652 N.E.2d 322, 327 (1995). Consequently, "[a] sentence within the statutory limits will not be disturbed absent an abuse of discretion." *Coleman*, 166 Ill. 2d at 258.

¶ 63 1. *Abuse of Discretion in Sentencing*

¶ 64        Having been convicted of armed robbery while armed with a handgun (720 ILCS 5/18-2(a)(2) (West 2014)), defendant faced a possible sentence between 21 and 45 years. The trial court ultimately imposed a sentence of 25 years in DOC followed by 3 years' MSR. Defendant's sentence, therefore, falls within the statutory range and we will not disturb the trial court's decision absent an abuse of discretion.

¶ 65        Pulling from case law, defendant argues "an abuse of discretion may be found even when a sentence is within the statutory limitations, particularly where the defendant is young and has rehabilitative potential." *People v. Margentina*, 261 Ill. App. 3d 247, 249, 634 N.E.2d 29, 31 (1994). Defendant cites a line of cases discussing how young people are immature and tend to act impulsively or recklessly and how young people have greater rehabilitative potential. Defendant reasons these cases instruct that a young defendant's age should result in a lesser sentence. But the cases he cites involve crimes committed by juveniles who received sentences ranging from life without parole to *de facto* life sentences or death sentences. See *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012); *Graham v. Florida*, 560 U.S. 48, 68-69 (2010); *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *People v. Reyes*, 2016 IL 119271, ¶ 9, 63 N.E.3d 884. We acknowledge the helpful discussions of youth in these cases, but we find them unpersuasive here. First, those cases addressed defendants who committed their offenses when they were juveniles, which is not the case here. Defendant was an adult, albeit a young adult, when he committed the instant offense. Second, those cases involved defendants getting the maximum sentences allowed under law, which, again, does not compare to this case where defendant received a sentence (25 years) near the minimum sentence possible (21 years).

¶ 66        Highlighting the specific facts of his case, defendant notes he was only 18 years old when he committed this offense and showed rehabilitative potential. He points out he

graduated from high school and began training to be a certified emergency medical technician and volunteer firefighter. Defendant further noted he had no prior criminal history. But the trial court noted most of these facts during sentencing. It referenced how unusual it was for a person of defendant's age, with his rough upbringing, to have no prior criminal history. The trial court even commended defendant for staying out of trouble during his childhood. However, as is clear from the transcript, the trial court found the need to deter other young males from serious gun violence outweighed the defendant's own youth or rehabilitative potential, which is not an abuse of discretion. See *Coleman*, 166 Ill. 2d at 261 ("A defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense."). We will not "reweigh the factors involved in [the trial court's] sentencing decision." *Coleman*, 166 Ill. 2d at 262.

¶ 67        We find no abuse of discretion in the trial court's decision sentencing defendant to 25 years in DOC. The trial court properly considered defendant's youth and rehabilitative potential under the circumstances of this particular case.

¶ 68                    2. *Improper Aggravating Factor*

¶ 69        Defendant next contends the trial court committed another sentencing error by considering conduct inherent in the offense of armed robbery (receiving compensation) as an aggravating factor. Defendant acknowledges he neither objected to this issue during sentencing, nor did he raise this issue in the posttrial motion. He, therefore, invokes the plain-error doctrine. "[T]o warrant plain-error review, an error at sentencing must be 'sufficiently grave that it deprived the defendant of a fair sentencing hearing.' " *People v. Scott*, 2015 IL App (4th) 130222, ¶ 52, 25 N.E.3d 1257 (quoting *People v. Ahlers*, 402 Ill. App. 3d 726, 734, 931 N.E.2d 1249, 1256 (2010)). We find the trial court committed no error, let alone plain error.

¶ 70        "The Unified Code of Corrections *** (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2014)) sets forth mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65, 129 N.E.3d 755. One such statutory aggravating factor is that "the defendant received compensation for committing the offense." 730 ILCS 5/5-5-3.2(a)(2) (West 2014). While "[a] circuit court has wide latitude in both determining and weighing factors in mitigation and aggravation when exercising its discretion and imposing sentence" (*People v. Solis*, 2019 IL App (4th) 170084, ¶ 23, 138 N.E.3d 247), the "court should not consider as an aggravating factor an element that is inherent in the crime for which the defendant is being sentenced." *People v. O'Toole*, 226 Ill. App. 3d 974, 992, 590 N.E.2d 950, 962 (1992) (citing *People v. Saldivar*, 113 Ill. 2d 256, 269, 497 N.E.2d 1138, 1143 (1986)). Because a "strong presumption exists the circuit court based its sentencing determination on proper legal reasoning" (*Solis*, 2019 IL App (4th) 170084, ¶ 26), "[t]he defendant bears the burden to affirmatively establish that the sentence was based on an improper factor." *Hibbler*, 2019 IL App (4th) 160897, ¶ 65. "Whether the circuit court relied on an improper factor in imposing the defendant's sentence presents a question of law, which we review *de novo*." *Solis*, 2019 IL App (4th) 170084, ¶ 26.

¶ 71        Defendant fails to cite a single case that expressly holds compensation is an inherent factor in the offense of armed robbery and, therefore, cannot be used as an aggravating factor. He cites, instead, *People v. Conover*, 84 Ill. 2d 400, 405, 419 N.E.2d 906, 909 (1981), which addressed burglary and theft, where our supreme court said: "[W]e believe receiving compensation for committing the offense under the statute applies only to a defendant who receives remuneration, *other than proceeds from the offense itself*, to commit a crime." (Emphasis added.) Simply put, the *Conover* court held the aggravating factor of compensation

should be applied in a burglary or theft case or any case "where proceeds may be taken" only if the defendant was paid to commit the offense. *Conover*, 84 Ill. 2d at 405. If the defendant was not paid to commit the burglary, theft, or a crime where proceeds are taken, like robbery, then using compensation as an aggravating factor is inappropriate. Regardless of whether or not the proceeds of an armed robbery are *compensation*, they are still proceeds of the armed robbery and not properly considered an aggravating factor.

¶ 72    In arguing the trial court improperly considered that he received compensation for the robbery, *i.e.*, the proceeds from the robbery, defendant highlights the State's argument at sentencing, where the State claimed: "He did this for $20 ***. *** He's here 'cause he took a loaded gun down the street and pointed it at a man for no reason, for $20, that's why he's here." Defendant reasons the trial court must have heeded the State's argument because, when discussing statutory factors in aggravation, the court said:

> "He received compensation. That's the whole point of an armed
>
> robbery. Although from my recollection of the testimony, the
>
> compensation that he received was groceries, which he promptly
>
> discarded."

The record, therefore, conclusively shows the trial court briefly mentioned compensation within the context of proceeds of the armed robbery when discussing aggravating factors; however, merely mentioning an inherent factor does not amount to reversible error. To be sure, "a sentencing court need not unrealistically avoid any mention of such inherent factors, treating them as if they did not exist." *O'Toole*, 226 Ill. App. 3d at 992. Rather, a trial court errs by affording the inherent factor significant weight where a reviewing court can determine the trial court relied on the inherent factor or based the sentence on that factor. See *Solis*, 2019 IL App

(4th) 170084, ¶ 26 (stating a defendant must "establish[ ] his or her sentence *was based* on improper considerations" (Emphasis added.)); *People v. Bourke*, 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340 (1983) ("[W]here it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required."). This record does not indicate the trial court placed any weight on the fact that defendant received compensation—a pizza—from the robbery. Once the court mentioned compensation within the context of its discussion of aggravating factors, it immediately acknowledged it is implicit in armed robbery. More importantly, the trial court diminished the compensation defendant received, saying it "was groceries, which [defendant] promptly discarded." By contrast, the court emphasized deterrence as a factor in aggravation— "the sentence is necessary to deter others from committing the same crime." 730 ILCS 5/5-5-3.2(a)(7) (West 2014). The court stated:

> "Some sentence is necessary for a deterrent effect and, as *** both [parties] acknowledge, gun violence has become an outrageous problem in this community and something needs to be done to tell particularly young males that gun violence will not be tolerated. I believe [defendant's] family has suffered as a result of the gun violence in this community."

When rendering the sentence, the court said again, "considering all of the factors in aggravation, *particularly the deterrent effect*, I believe a sentence of 25 years is the most appropriate sentence in this case." (Emphasis added.) Based on the record, we find the trial court simply mentioned compensation and did not give it any weight in determining an appropriate sentence. Since defendant failed to "affirmatively establish that [his] sentence was based on an improper factor"

(*Hibbler*, 2019 IL App (4th) 160897, ¶ 65), he did not rebut the "strong presumption" that the trial court's sentencing decision rests on "proper legal reasoning." *Solis*, 2019 IL App (4th) 170084, ¶ 26. We hold the trial court committed no sentencing errors here.

¶ 73                              E. Sixth Amendment: Right to Counsel of Choice

¶ 74          Next, defendant argues he was denied his sixth amendment right to the attorney of his choice. According to defendant, attorney Harvey Welch entered his appearance and represented defendant at trial even though no one—neither defendant nor defendant's family—hired him. Again, we disagree.

¶ 75          The sixth amendment provides criminal defendants the right to counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). This right to counsel includes "the right of a defendant who does not require appointed counsel to choose who will represent him." *Gonzalez-Lopez*, 548 U.S. at 144; see also *People v. Baez*, 241 Ill. 2d 44, 104-05, 946 N.E.2d 359, 395 (2011). Defendants can choose their counsel by either "positive action or by acquiescence." *People v. Herrera*, 96 Ill. App. 3d 851, 855, 422 N.E.2d 95, 98 (1981). Courts generally hold a defendant "exercised [the] right [to counsel of choice] when he *appears* in court with an attorney[ ] and *treats* the attorney as his retained counsel." (Emphases added.) *Herrera*, 96 Ill. App. 3d at 855. Indeed, "[w]hen a privately retained counsel appears in court for a defendant" there arises a rebuttable presumption the defendant authorized counsel to appear and is the defendant's attorney of choice. *Herrera*, 96 Ill. App. 3d at 855; see also *Lydon v. Eagle Food Centers, Inc.*, 297 Ill. App. 3d 90, 93-94, 696 N.E.2d 1211, 1214 (1998).

¶ 76          Our supreme court has held: "Violations of the right to counsel of choice are structural errors," meaning defendants need not show they were prejudiced by the violations. *Baez*, 241 Ill. 2d at 105; see also *Gonzalez-Lopez*, 548 U.S. at 150 (stating "erroneous

deprivation of the right to counsel of choice, *** unquestionably qualifies as structural error" (Internal quotation marks omitted.)). We review *de novo* a defendant's claim that he was denied his sixth amendment right to retained counsel of his choice. See *People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607.

¶ 77       The record shows Harvey Welch entered his appearance on October 11, 2016, by filing a "Substitution of Attorney" containing defendant's signature. He filed a bond assignment on October 7, 2016, providing for payment out of defendant's bail bond. That also bore the apparent signature of defendant. Welch later testified defendant's uncle, Benny Smith, hired him and signed the substitution form on defendant's behalf because Smith said defendant was working at the time. It is reasonable to conclude that Benny also signed defendant's name on the October 7, 2016, bond assignment. Smith informed Welch that it "was [defendant's] desire to change counsel" and move on from the public defender. Welch testified that he maintained "frequent contact" with defendant's uncle, Benny Smith, before and during trial. Defendant, however, had disappeared and had no contact with Welch or the court until March 14, 2017, when he reappeared for sentencing. At that sentencing hearing, when the trial called defendant's name and case number, defendant answered, "Yes, sir." The trial court directed defendant, "Do you want to come up here and join your attorney, sir?" Defendant sat next to Welch at counsel's table during the hearing and began to leave with the sheriff after the court granted the State's request that he be taken into custody. Defendant did not raise any objection to Welch as his attorney during this brief hearing. Only when Benny Smith interrupted the proceedings and said defendant never hired Welch and claimed Welch stole money from the family did defendant claim that Welch was not his attorney.

¶ 78    The trial court also recounted its perspective of these events during the hearing on defendant's posttrial motion. The court described the March 14, 2017, hearing in minute detail. It noted how defendant sat next to Welch at counsel's table. The court observed defendant "did not question who Mr. Welch was" and "[h]e didn't say anything about him or object to his appearance at that time." The trial court then recounted how it heard arguments from the parties and eventually granted Welch's request for a continuance on the posttrial motion and sentencing. The court even documented on the record the parties' discussion of possible dates for the next hearing. The trial court stated defendant followed its order "to go with the deputy" and "[defendant] was heading towards the door to the holding cell with the deputy when" Benny Smith interrupted the proceedings and began making claims about Welch. The trial court observed, "That's the very first time during that proceeding when the defendant personally made any suggestion that Mr. Welch was not his attorney and it came only after the uncle, who apparently orchestrated the trip to Sarah Bush Lincoln [Hospital] in Charleston, had started to make comments to the effect that Mr. Welch was never hired by the defendant." In finding defendant exercised his right to counsel of choice and denying defendant's posttrial motion, the trial court later stated: "The defendant at no time objected to Mr. Welch's appearance until after the trial was over and he initially appeared—and, when he initially appeared, he seemed to acquiesce in Mr. Welch's continued representation until his uncle started to interject suggestions that the defendant had not actually hired him."

¶ 79    Though brief, we find defendant acquiesced to (and even ratified) Welch's representation by *appearing with* him at the sentencing hearing and *treating* Welch as his attorney during that hearing. See *Herrera*, 96 Ill. App. 3d at 855; see also *People v. Assenato*, 257 Ill. App. 3d 1026, 1029, 629 N.E.2d 166, 169 (1994) ("Where a defendant does not object to

his counsel's representation, he is deemed to have acquiesced in that representation," and " 'is deemed to constitute a ratification of defendant's employment of that attorney and the exercise of his right to counsel of his choice.' ") (quoting *People v. Smalley*, 178 Ill. App. 3d 314, 318, 533 N.E.2d 428, 431 (1988)). Alternatively, we find defendant authorized his uncle to hire Welch. The record shows Benny Smith tried several times to act on defendant's behalf, attempting to submit documents for defendant and obtain a guardianship over him. The record further shows defendant lived with Smith. We find credible Welch's testimony that Benny hired him with defendant's approval.

¶ 80                          F. Ineffective Assistance of Counsel

¶ 81          Finally, defendant argues attorney Welch rendered ineffective assistance when opposing and objecting to the trial *in absentia* because "Welch knew [defendant] was in the psychiatric ward of the hospital on the day of trial but failed to notify the trial court."

¶ 82          The sixth amendment to the United States constitution guarantees criminal defendants the right to counsel and mandates " 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)); U.S. Const., amends. VI, XIV. When presented with a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test. The defendant must prove (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms and (2) counsel's deficient performance prejudiced the defendant, *i.e.*, but for counsel's errors the result of the proceeding would have been different. See *People v. Young*, 341 Ill. App. 3d 379, 383, 792 N.E.2d 468, 472 (2003) (citing *Strickland*, 466 U.S. at 687); *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26, 79 N.E.3d 232. If a defendant

fails to prove deficient performance, the court need not consider the prejudice prong, and vice versa. *People v. Torres*, 228 Ill. 2d 382, 395, 888 N.E.2d 91, 100 (2008); *People v. Graham*, 206 Ill. 2d 465, 476, 795 N.E.2d 231, 238 (2003).

¶ 83    Defendant believes Welch's failure to oppose the trial *in absentia* by informing the court of defendant's hospitalization amounts to ineffective assistance because Welch abdicated his " 'overarching duty to advocate the defendant's cause' and '[his] duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.' " *People v. Jackson*, 318 Ill. App. 3d 321, 326, 741 N.E.2d 1026, 1030 (2000) (quoting *Strickland*, 466 U.S. at 688). In terms of the two-part *Strickland* test, defendant reasons Welch's decision not to tell the court that defendant was hospitalized was objectively unreasonable and, therefore, deficient performance. Likewise, defendant claims the deficient performance prejudiced him because, had Welch informed the court of defendant's whereabouts, he would not have been tried *in absentia*. We disagree.

¶ 84    The record shows Welch was unsure of defendant's whereabouts before and during trial. Welch testified he was unable to meet with defendant before trial. When asked if defendant's uncle told Welch why defendant had not met with him or appeared at hearings, Welch responded: "I was told, I think, he was in several different places." Welch testified Benny Smith eventually told him defendant was hospitalized and he attempted to confirm that information by calling hospitals. Welch testified he "made several calls to hospitals trying to locate [defendant]" and even called Sarah Bush Lincoln Hospital, but he "could not locate [defendant]." Coupled with defendant's refusal to permit hospital staff to contact his lawyer for him or give them authority to acknowledge his presence when Welch called, defendant's argument borders on the disingenuous and warrants as much credence as his claim he was absent

from trial involuntarily due to his hospitalization. In light of these facts, we cannot endorse defendant's claim that "Welch *knew* [defendant] was in the psychiatric ward of the hospital on the day of trial." (Emphasis added).

¶ 85 Contrary to defendant's claim, "[t]he proper measure of an attorney's performance is not what is in the best interest of his client but what a reasonable attorney would do under the circumstances." *People v. Leuze*, 282 Ill. App. 3d 126, 128, 668 N.E.2d 232, 234 (1996). Our analysis of "[w]hat a reasonable attorney would do is guided by, among other things, the Rules of Professional Conduct." *Leuze*, 282 Ill. App. 3d at 128. Rule 3.3 of the Illinois Rules of Professional Conduct of 2010 (Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1)(eff. Jan. 1, 2010)) commands that attorneys owe a duty of candor to the court, meaning they cannot make a false statement or present evidence they know to be false. In light of this duty, we cannot fault Welch for not relaying speculative information to the court. At best, Welch knew Benny was telling him that defendant was hospitalized but without specifying where defendant had been admitted. Even if Welch had a hunch where defendant was, we do not think it objectively unreasonable for him to try and verify that hunch before revealing it to the trial court, especially given his duty of candor. The record confirms Welch twice objected to proceeding with the trial *in absentia*, though at neither time did he offer an explanation of defendant's location. But Welch could not tell the court something he did not know to be true. Because Welch could not conclusively confirm defendant's whereabouts and possessed only unverified information, we cannot conclude he provided deficient performance—his conduct did not fall below an objective standard of reasonableness based on prevailing professional norms, *i.e.*, the Rules of Professional Conduct. Since we find no deficient performance, we need not consider *Strickland*'s prejudice prong. *Torres*, 228 Ill. 2d at 395.

¶ 86                                III. CONCLUSION

¶ 87        For the reasons stated, we affirm the trial court's judgment.

¶ 88        Affirmed.